922 A.2d 1279

JOSEPH JERKINS, AN INFANT BY HIS GUARDIAN AD LITEM, CHARLES JERKINS; CHARLES JERKINS AND TONI JER-KINS, INDIVIDUALLY, PLAINTIFFS–RESPONDENTS, v. SOW-ETO ANDERSON; KEMBA N. ANDERSON; JOHN DOES 1–10 (FICTITIOUS INDIVIDUALS) AND ABC CORPORATIONS 1–10 (FICTITIOUS ENTITIES), DEFENDANTS, AND BOARD OF ED-UCATION OF PLEASANTVILLE PUBLIC SCHOOLS AND RO-SEMAY CLARKE, DEFENDANTS–APPELLANTS.

Argued February 20, 2007—Decided June 14, 2007.

*Gregory J. Giordano* argued the cause for appellants (Lenox, Socey, Wilgus, Formidoni, Brown, Giordano & Casey, attorneys; *Mr. Giordano* and *Margaret A. Chipowsky,* on the briefs).

*Scott K. McClain* argued the cause for respondents (Winne, Banta, Hetherington, Basralian & Kahn, attorneys).

*John J. Burns* argued the cause for amicus curiae, New Jersey School Boards Association (*Cynthia J. Jahn,* General Counsel, attorney; *Donna M. Kaye,* Senior Counsel, on the letter brief).

Chief Justice ZAZZALI delivered the opinion of the Court.

Nine-year-old Joseph Jerkins was dismissed from school on an early-dismissal day, walked off school grounds without an adult, and was struck by a car a few blocks from school later that afternoon. The accident paralyzed Joseph from the neck down. He and his family filed a complaint alleging that the school district and principal breached their duty of reasonable supervision with respect to Joseph's dismissal from school. The Law Division granted defendants' motion for summary judgment, finding that their duty of care did not apply to an accident that occurred hours after Joseph's dismissal and blocks from his school. The Appellate Division reversed, holding that schools have a duty of reasonable care to supervise children at dismissal, and remanded the matter for a trial to determine whether that duty was breached here.

In this appeal, we must determine whether schools have a duty of reasonable supervision during dismissal and, if so, we must define the scope of that duty. We find that because a school's duty to exercise reasonable care for the children in its custody is integral to our public education system, the duty does not summarily disappear when the school bell rings. Accordingly, we hold that schools in New Jersey must exercise a duty of reasonable care for supervising students' safety at dismissal. The duty requires school districts to create a reasonable dismissal supervision policy, provide suitable notice to parents of that policy, and

effectively comply with the policy and subsequent and appropriate parental requests concerning dismissal. We therefore substantially affirm the decision of the Appellate Division and remand the matter to the trial court for further proceedings consistent with this opinion.

## I.

### A.

Joseph was a third-grade student at the South Main Street elementary school in Pleasantville, New Jersey. He transferred to the school in October of 2000. The school is located on a busy thoroughfare and is part of the Pleasantville School District, a "walking district" with no bus service. According to plaintiffs, Joseph regularly walked to and from school with either his adult brother, another family member, or a babysitter.

On the morning of June 15, 2001, an early-dismissal day, Charles Jerkins, Jr., Joseph's adult brother, walked Joseph to school. Joseph and his classmates were released from school at approximately 1:30 p.m. Joseph left school grounds unattended, played with friends, and, according to his father, may have gone swimming. Although the intervening events are unclear due to Joseph's inability to recall details of that afternoon, at 3:50 p.m., he was struck by a car, driven by Soweto Anderson and owned by Kemba Anderson, at an intersection several blocks from the school and in a different direction from his home. The accident severely injured Joseph, rendering him a quadriplegic. That same afternoon, Charles, Jr., arrived at the school at around 2:50 p.m., the regular pick-up time. He did not see Joseph at his normal meeting location and learned from a parent in the school lobby that there had been an early dismissal. Charles, Jr., proceeded to search for Joseph at school and at home, but later learned that Joseph had been injured in an automobile accident.

The school district had a four-page policy memorandum titled "Pupil Safety" that addressed a wide range of student safety

topics, including supervision of students at dismissal time. The memorandum stated that "[t]he chief school administrator shall seek the cooperation of parents/guardians to prevent any children [from] being unsupervised on school property during lunch hour and during morning arrival and afternoon dismissal times." The memorandum did not, however, outline how dismissal supervision would be administered by the schools.

Instead, the school adhered to a practice that all school personnel supervise dismissal. On a typical school day, the school's five hundred students were dismissed at 2:50 p.m. Teachers escorted the students from their classrooms to designated exits at the sounding of the school bell, and "[t]he teacher[s] remain[ed] at their designated duty stations to insure that the children leave the school premises." According to the school principal, all school personnel—including teachers, teachers' aides, and security personnel—supervised dismissal to ensure that the children left school before the adults. The principal personally supervised early-dismissal days to "make sure that there were no children whose parents did not pick them up and they were still outside."

Because the school was in a "walking district," students walked home from school at dismissal unless they were picked up or were enrolled in the after-school program. If a student was instructed by a guardian not to walk home, but was not picked up, the student could ask a school official to contact a guardian. If the school could not reach the guardian, the child would be allowed to remain at the after-school program. Parents, on a case-by-case basis, also could call the school to provide instructions to the school if they anticipated being late. Joseph was not registered in the after-school program, and no guardian had requested that the school release him only to the custody of an adult.

Joseph's family members stated that they did not know that June 15 was a scheduled early-dismissal day. The school, however, identified numerous occasions when it informed students and their guardians of the school calendar, including the scheduled June 15 early dismissal. For example, the school provided a

handbook, which included the district calendar, to all students at the start of the school year. Joseph's father registered Joseph in October, a month into the school year. According to the principal, parents who register students during the school year, such as Joseph's father, should receive the handbook together with other paperwork during the registration process. Although Joseph's father acknowledged that he received a registration packet when he registered Joseph, he did not remember receiving the school handbook. The handbook contained a form to be signed and returned by the student's parent or guardian confirming its receipt. The school claims that it discarded all the signed forms at the end of the academic year, and, therefore, could not produce a form signed by Joseph's guardian.

In addition to the student handbook, the school informed parents of the June 15 early dismissal by providing an annual calendar to parents at back-to-school night and distributing copies of the annual calendar to students to bring home. A calendar for June also was included in the June 2001 monthly newsletter, which was mailed to all Pleasantville households, provided to every student at school, and was available in the school's front office. Further, the school distributed a monthly schedule of events to each student to take home, and retained additional copies of the schedule at the school. Finally, near the end of the academic year, the school sent home a "reminder notice" with each student that reiterated the early-dismissal days for June. The father acknowledges receiving documentation from the school during the year, but does not recall whether he received a school newsletter, annual calendar, monthly calendar, or reminder notice.

Jerkins family members assert that they were not made aware of the early-dismissal days, including June 15, through any school communications. The family contends that it usually learned of the school schedule through Joseph. Joseph's brother stated that Joseph came home early from school on June 14—the day before the accident—and told him and their father that there had been a half-day at school that day. However, Joseph's father and brother

both stated that Joseph did not inform them that—nor did they inquire whether—there would be an early dismissal the next day, June 15.

### B.

In December 2002, Joseph, through his guardian *ad litem*, Charles, Sr., and Charles, Sr., and Joseph's mother Toni Jerkins, individually, filed a complaint alleging that the Pleasantville Board of Education and the school principal "negligently, carelessly[,] and recklessly fail[ed] to exercise their duty of reasonable supervision of the infant, Joseph Jerkins, [so] as to cause grievous and permanent bodily injuries ... to Joseph." Plaintiffs also brought claims against the Andersons for negligent operation of the automobile that hit Joseph and against unnamed individuals and entities. The school district and the principal moved for summary judgment. The trial court granted the motion, finding that although Joseph's injuries may have been foreseeable, the school was not responsible for preventing injuries that occurred hours after dismissal. Plaintiffs thereafter settled with the Andersons and subsequently appealed the trial court's grant of summary judgment.

The Appellate Division reversed and remanded, finding it foreseeable that a nine-year-old child, who was not met by an adult at dismissal, would remain unsupervised for hours and later be injured. The panel then considered the factors that courts apply when determining whether a duty exists, namely, the relationship between the parties, the nature of the attendant risk, a defendant's ability and opportunity to exercise reasonable care, and the public interest, *see Carvalho v. Toll Bros. & Developers*, 143 *N.J.* 565, 572, 675 *A.*2d 209 (1996) (citing *Carter Lincoln–Mercury, Inc. v. EMAR Group, Inc.*, 135 *N.J.* 182, 194, 638 *A.*2d 1288 (1994)), and found that those factors supported the imposition of a duty of care during dismissal. Recognizing that genuine issues of material fact existed, the Appellate Division remanded the matter for a trial to "determine whether the [school district] and [principal]

were negligent in allowing Joseph to leave the school on June 15, 2001 without the supervision of an adult or responsible sibling" and, if so, whether "defendants' negligence was a proximate cause of Joseph's injury." [1]

We granted defendants' petition for certification. 188 *N.J.* 490, 909 *A.2d* 725 (2006). We also permitted the New Jersey School Boards Association to submit a brief as amicus curiae.

## II.

■■■■ Whether a duty of care exists is a question of law that must be decided by the court. *See Carter Lincoln–Mercury, Inc., supra,* 135 *N.J.* at 194, 638 *A.2d* 1288. In making that determination, the court must first consider the foreseeability of harm to a potential plaintiff, *Carvalho, supra,* 143 *N.J.* at 573, 675 *A.2d* 209 (holding that foreseeability of injury is "predicate for the duty to exercise reasonable care"), and then analyze whether accepted fairness and policy considerations support the imposition of a duty, *see Carter Lincoln–Mercury, Inc., supra,* 135 *N.J.* at 194–95, 638 *A.2d* 1288. We will now examine foreseeability, and each of the fairness and policy considerations, in turn.

## A.

■■■■ Foreseeability of injury, as it affects the existence of a duty, refers to "the knowledge of the risk of injury to be appre-

---

[1] Under New Jersey's Tort Claims Act, "[a] public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances," *N.J.S.A.* 59:2–2(a), and "a public employee is liable for injury caused by his act or omission to the same extent as a private person," *N.J.S.A.* 59:3–1(a). The Appellate Division in this appeal recognized that, in both respects, "public entities and public employees are entitled to any immunities which are provided by law." *See N.J.S.A.* 59:2–1(b); *N.J.S.A.* 59:3–1(b). The appellate panel observed that the issue of immunity was not decided by the trial court and should be "addressed in the first instance by the trial judge." That question was not appealed to this Court and is thus not a subject of our decision.

hended." *Clohesy v. Food Circus Supermarkets, Inc.,* 149 *N.J.* 496, 503, 694 *A.*2d 1017 (1997) (quoting *Hill v. Yaskin,* 75 *N.J.* 139, 144, 380 *A.*2d 1107 (1977)). "The risk reasonably to be perceived defines the duty to be obeyed; it is the risk reasonably within the range of apprehension, of injury to another person, that is taken into account in determining the existence of the duty to exercise care." *Ibid.* The ability to foresee harm "does not in itself establish the existence of a duty, ... but it is a crucial element in determining whether imposition of a duty on an alleged tortfeasor is appropriate." *Carter Lincoln–Mercury, Inc., supra,* 135 *N.J.* at 194, 638 *A.*2d 1288 (citations omitted).

During the school day, children face many foreseeable dangers. *See Lucas v. Fresno Unified Sch. Dist.,* 14 *Cal.App.*4th 866, 18 *Cal.Rptr.*2d 79, 82 (1993) (explaining that students' "commonly known tendency ... to engage in aggressive and impulsive behavior" exposes them to risk of harm) (citation omitted). Those dangers continue at dismissal because children are susceptible to numerous risks, including negligent conduct, when leaving school property. And, the younger the child, the greater the risk, for younger children are less able—and less likely—to discern danger. *See Bush v. N.J. & N.Y. Transit Co.,* 30 *N.J.* 345, 355, 153 *A.*2d 28 (1959) (recognizing that age is significant to child's appreciation of perils) (internal quotations and citation omitted). It is therefore foreseeable that a young child, exiting school grounds without parental or other supervision, may be vulnerable to harm.

## B.

Beyond foreseeability, the question whether a duty exists is "one of fairness and policy that implicates many factors." *Carvalho, supra,* 143 *N.J.* at 572, 675 *A.*2d 209 (citing *Dunphy v. Gregor,* 136 *N.J.* 99, 110, 642 *A.*2d 372 (1994)). The inquiry involves identifying, weighing, and balancing four factors: "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." *Id.* at 573, 675 *A.*2d 209 (citing *Hopkins v. Fox & Lazo*

*Realtors,* 132 *N.J.* 426, 439, 625 *A.*2d 1110 (1993)).  The court must examine all of the attendant circumstances in light of those and other relevant considerations and must engage in a fact-based and principled analysis.  *See Hopkins, supra,* 132 *N.J.* at 439, 625 *A.*2d 1110.

First, with respect to the relationship of the parties, parents entrust their children to the care of schools, and "[e]ducators have '[n]o greater obligation ... than to protect the children in their charge from foreseeable dangers, whether those dangers arise from the careless acts or intentional transgressions of others.' " *L.W. v. Toms River Reg'l Schs. Bd. of Educ.,* 189 *N.J.* 381, 406, 915 *A.*2d 535 (2007) (quoting *Frugis v. Bracigliano,* 177 *N.J.* 250, 268, 827 *A.*2d 1040 (2003)).  School officials have a general duty "to exercise reasonable supervisory care for the safety of students entrusted to them, and [are accountable] for injuries resulting from failure to discharge that duty." *Caltavuturo, supra,* 124 *N.J.Super.* at 366, 307 *A.*2d 114.

The relationship between the school, children, and parents encompasses the school's responsibility to ensure the safety of the children in its charge.  It logically flows from that relationship, particularly the caretaker role the school assumes, that school officials must reasonably supervise children throughout the school day, including dismissal time.  Because "parents ... relinquish their supervisory role over their children to teachers and administrators during school hours," and thus "transfer to school officials the power to act as guardians of those young wards," *Frugis, supra,* 177 *N.J.* at 268, 827 *A.*2d 1040, school officials have a duty to students until those officials have successfully monitored the students through dismissal.

Second, regarding the nature of the attendant risk, children face many potential dangers at dismissal. *Lucas, supra,* 18 *Cal. Rptr.*2d at 82.  Younger children, in particular, are unable "to understand and appreciate the perils that may threaten [their] safe being." *Bush, supra,* 30 *N.J.* at 355, 153 *A.*2d 28.  Indeed, "[c]hildren have a known proclivity to act impulsively without

thought of the possibilities of danger," and "[i]t is precisely th[at] lack of mature judgment which makes supervision so vital." *Titus, supra,* 49 *N.J.* at 75, 228 *A.*2d 65 (quotation omitted). Because a nine-year-old child may have difficulty appreciating and understanding dangers, the risk of harm to such a child without supervision is significant. The nature of that risk, which is reduced by supervision, supports the existence of a duty of care at dismissal.

Concerning the third *Carvalho* factor—the defendant's opportunity and ability to exercise care—school officials are already required to exercise reasonable care in supervising students during the school day. *Caltavuturo, supra,* 124 *N.J.Super.* at 366, 307 *A.*2d 114 (holding that "duty of school personnel to exercise reasonable supervisory care for the safety of students entrusted to them ... is firmly established") (citing *Jackson v. Hankinson,* 51 *N.J.* 230, 235–36, 238 *A.*2d 685 (1968)). Consistent with that school-day duty of care, educators generally have both the opportunity and the ability to supervise the actual process of dismissal. Schools are thus well-suited, and well-equipped, to fulfill that oversight responsibility during dismissal.

Finally, with respect to the public interest in imposing a duty on schools to supervise dismissal, our State has a strong interest in protecting children. *See In re Guardianship of K.H.O.,* 161 *N.J.* 337, 347, 736 *A.*2d 1246 (1999) (explaining that parental rights are tempered by State's responsibility to protect children). "New Jersey statutory law ... reflects the notion that school officials must be empowered to supervise and ensure the safety of students within reasonable limits." *Joye v. Hunterdon Cent. Reg'l High Sch. Bd. of Educ.,* 176 *N.J.* 568, 593, 826 *A.*2d 624 (2003). The Legislature declared in New Jersey's Public School Safety Law that "the safety and welfare of the public school students of this [S]tate while attending sessions of the public schools is a matter of prime concern to the citizens of this [S]tate." *N.J.S.A.* 18A:17–42.

Because that public interest is not quantifiable, our concern for the protection of children is not limited to those hours

that school is in session. *See Titus, supra,* 49 *N.J.* at 75, 228 *A.*2d 65 (holding that school has duty to supervise children at school prior to beginning of classes); *Law v. Newark Bd. of Educ.,* 175 *N.J.Super.* 26, 32, 417 *A.*2d 560 (App.Div.1980) (finding liability possible when student's injury was caused by participation in recreational program supervised by school employees). The public interest is not served if the duty of care during school hours arbitrarily ceases when the school bell rings. On the contrary, because it is consistent with the State's recognized goal of ensuring student safety during school hours, public policy strongly supports the school's duty to ensure reasonable supervision of students at dismissal.

Additionally, as part of our consideration of those fairness and policy factors, we recognize that "[w]hen the defendant's actions are 'relatively easily corrected' and the harm sought to be prevented is 'serious,' it is fair to impose a duty." *J.S. v. R.T.H.,* 155 *N.J.* 330, 339–40, 714 *A.*2d 924 (1998) (quoting *Kelly v. Gwinnell,* 96 *N.J.* 538, 549–50, 476 *A.*2d 1219 (1984)); *see also Tighe v. Peterson,* 175 *N.J.* 240, 243, 814 *A.*2d 1066 (2002) (Long, J., dissenting) ("Where the potential harm resulting from a risk is great and the means of avoiding it small, it is fair to impose a duty.") (quotation omitted); *Hopkins, supra,* 132 *N.J.* at 447, 625 *A.*2d 1110 (stating that "[n]egligence has often been defined as the failure to take precautions that cost less than the damage wrought"). As we have observed above, because the risk to children is significant, and because the additional burden on the school to supervise dismissal is minimal, the weighing of those considerations favors a duty of care for educators to reasonably supervise children during the dismissal process.

In sum, the question whether a duty exists is "one of fairness and policy that implicates many factors." *Carvalho, supra,* 143 *N.J.* at 572, 675 *A.*2d 209. After evaluating "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution," *id.* at 573, 675 *A.*2d 209 (quotation omitted), we find that

those considerations support the conclusion that educators have a duty to exercise reasonable care in supervising students during dismissal.

### C.

Our case law also supports the existence of a duty to reasonably supervise students at dismissal. For example, in *Titus, supra,* we considered the case of a nine-year-old child who was injured before school started when he was struck by a paper clip flung at him with a rubber band by an older child. 49 *N.J.* at 71, 228 *A.*2d 65. We held that schools must exercise reasonable care in supervising students commencing when the first students arrive in the morning and that the school is "from that point on obligated to exercise due care." *Id.* at 74–75, 228 *A.*2d 65. Although the principal's presence during the pre-bell time period indicated that he had assumed responsibility, the school was responsible based on the totality of the circumstances, not the principal's seemingly voluntary assumption of responsibility. *Id.* at 75, 228 *A.*2d 65. The Court observed that students customarily and properly arrived before the schoolhouse doors opened, the school was the morning pick-up site for three other schools in the district, and the principal knew about students' early-morning presence and activities. *Ibid.* *Titus* is thus germane to this appeal because in *Titus* the school's duty of care to supervise children was found to exist outside of school hours while the children were on school property.

The Appellate Division's opinion in *Caltavuturo* followed our holding in *Titus.* In *Caltavuturo, supra,* a twelve-year-old student who was dismissed from school to go home for lunch scraped his knee on a jagged portion of a corroded fence, causing infection, inflammation, and eventually a permanent bone disease. 124 *N.J.Super.* at 364, 307 *A.*2d 114. The panel rejected the school's contention that the principal's "legal responsibility continued only for the first and last minutes of the lunch period but not in between, or that his supervisory duties extended only so far as the municipal boundary line and not beyond." *Id.* at 366–67, 307 *A.*2d

114. Thus, in both *Titus* and *Caltavuturo,* our courts recognized a duty of care that extends beyond the classroom and refused to impose a rigid time frame on that duty.

### D.

Cases from other jurisdictions buttress the existence of a duty of care during dismissal. In *Sutton v. Duplessis,* the Court of Appeal of Louisiana determined that a school breached its duty of supervision when it allowed a six-year-old child to wander off school property while waiting for his mother on an early-dismissal day. 584 *So.*2d 362, 365 (1991). The court stated that a "school board has a duty to provide reasonable supervision commensurate with the age of the children under the attendant circumstances," *id.* at 366, and, consistent with that duty, must "have a policy to insure that younger students . . . are properly supervised and do not leave the school unattended," *id.* at 365. *See also Gary v. Meche,* 626 *So.*2d 901, 905 (La.Ct.App.1993) (holding that school's duty to supervise children requires "a policy to insure that young children, such as [a six-year-old], do not leave the school unattended"). Similarly, in *Perna v. Conejo Valley Unified School District,* the California Court of Appeals held that "a school district may be held liable for injuries suffered by a student off school premises and after school hours when those injuries are the result of the school's negligence while the student was on school premises." 143 *Cal.App.*3d 292, 192 *Cal.Rptr.* 10, 10 (1983).

Accordingly, we find that dismissal is a part of the school day and that case law from New Jersey and other jurisdictions supports the existence of a duty to exercise reasonable care in supervising children during dismissal.

### III.

In view of our finding that schools have a duty of care to supervise children during dismissal, we now examine the nature and scope of that duty.

From the precedent supporting the existence of a duty at dismissal, it naturally follows that the duty is defined by a standard of reasonableness. *See Titus, supra,* 49 *N.J.* at 68, 228 *A.*2d 65 (observing that "duty of school personnel to exercise reasonable supervisory care ... [is] well-recognized") (citations omitted); *Caltavuturo, supra,* 124 *N.J.Super.* at 366, 307 *A.*2d 114 (same); *Model Jury Charge (Civil),* § 5.32, "Duty of Teacher and School Personnel to Student" (1980) (stating that school personnel owe "duty to exercise reasonable care," namely, "degree of care which a person of ordinary prudence, charged with comparable duties, would exercise under the circumstances"); *accord Sutton, supra,* 584 *So.*2d at 366 (recognizing "duty to provide reasonable supervision").

That standard is both flexible, assuring fairness for all parties, and comprehensive, because "proper supervision depends largely upon the circumstances attending the event." Allan E. Korpela, Annotation, *Tort Liability of Public Schools and Institutions of Higher Learning for Injuries Resulting From Lack or Insufficiency of Supervision,* 38 *A.L.R.*3d 830 (2007). The reasonableness standard is designed to address a clear and precise question: whether, under the totality of the circumstances, a defendant's conduct comported with that of a reasonable educator in like circumstances. Therefore, consistent with our jurisprudence, a reasonableness standard should be applied to evaluate New Jersey educators' efforts to supervise students at dismissal.

### A.

In light of that reasonableness standard, we now consider the specific elements of the duty to exercise reasonable care in a manner that both delineates the school district's responsibilities and accounts for others' responsibilities to children, particularly the responsibility owed by parents to their children.

There are, simply put, three elements to the school's duty of care in this context: (1) the school must adopt a reasonable policy concerning dismissal and the manner in which students of differ-

ent ages will be dismissed; (2) the school must provide adequate notice of that policy to all parents or guardians; and (3) the school must effectively implement that policy and adhere to parents' reasonable requests regarding dismissal.

First, satisfaction of that duty requires school districts to adopt a policy governing dismissal practices. That policy should include, at a minimum, sufficient detail about the adult supervision and patrols present during dismissal, the assigned duties and locations of those adults at dismissal, and procedures for early-dismissal days. We leave it to the sound discretion of educators to formulate a specific policy that satisfies the school district's responsibilities and is tailored to the district's unique circumstances.

Second, in order for the school to implement its responsibilities, school districts must notify parents of the adopted dismissal policy, specifically informing parents of what to expect from the school district regarding the school day's end, the school calendar, and typical dismissal protocol. The school district, therefore, must provide notice reasonably calculated to apprise parents of what they can and should expect the school will do when releasing children, and the time of dismissal for each day of the school year. The school must inform parents what supervision will be provided by the school district at school day's end and what supervised after-school services, if any, will be available to students at the school's facilities after formal dismissal. It is the responsibility of the school district to inform parents of the process for enrolling a student in such after-school programs.

Further, in respect of the school district's transfer of responsibility for students to parents at day's end, the school district's notice must inform parents what the usual circumstances at dismissal will be regarding a student's release to walk home.[2] The school district's duty is to inform parents that they must

---

[2] Those policies, of course, will vary with the age of the child. It is significant here that this child was not a four- or five-year-old. As to a child of very young age, it might be unreasonable to allow the child to walk home alone.

instruct the school not to allow the child to walk home unescorted if that is the parents' desire. And, further, the district must provide some means for parents to make known to the district their specific wishes in that regard. It is plainly the parents' obligation to inform the school of the parents' decision that the child should not be allowed to walk home unescorted by an adult or designated older child.

Third, the duty requires faithful adherence to a reasonable, published dismissal practice, including compliance with a parent's or guardian's instructions about releasing a child to walk home alone. If instructed not to permit a child to walk home alone, a district must retain supervision over the child while the student remains on school property awaiting the arrival of the appropriate escort or designated transportation. The district must have a plan for emergencies such that, when an unforeseen event prevents a parent or designated escort from arriving for the child at dismissal, the child will be provided some form of temporary, supervised shelter.

The school district's duty is thus discharged through the adoption of, notice to parents or guardians of, and compliance with a reasonable dismissal policy. As a result, the district can plan for and execute the necessary steps to satisfy a duty of reasonable care in the dismissal of students at the close of each school day.[3]

## B.

When we consider a school district's duty to exercise reasonable care, we must view that duty in the larger context of student

---

[3] As the trial court observed, "nothing in the record ... establishes any standard with respect to the school districts of New Jersey ... that for a school-age child of particular years ... there [is] some standard as to what you'd do at the end of a school day and how it's done." Given that void, we encourage the Department of Education to formulate guidelines for New Jersey's school districts on appropriate policies for dismissal supervision. Such guidance would aid school districts in their development—or refinement—of dismissal policies and assist future triers of fact in their assessment of the school's conduct.

dismissal, with due consideration for how responsibility may be borne by other entities outside the educators' control. In doing so, we address not only the responsibilities owed by parents or guardians to their children, but also the role of other state actors and relevant statutory schemes.

For example, state requirements about pupil transportation and pupil safety determine a school district's "walking" status. Specifically, state law establishes and defines a district's obligation to provide transportation to pupils living certain distances from school. *See N.J.S.A.* 18A:39–1 (requiring provision of transportation by school district to elementary school pupils living more than two miles from school and to secondary school pupils living more than two and a half miles from school); *N.J.S.A.* 18A:46–23 (requiring provision of transportation by school district to handicapped pupils); *see also N.J.S.A.* 18A:39–1.2 (authorizing, on determination by municipal governing body that pupil safety concerns warrant provision of pupil transportation notwithstanding lack of remoteness, intergovernmental agreement between school district and municipality for provision of pupil transportation at municipal expense); *N.J.S.A.* 18A:39–1.3 (authorizing school district to enter into contracts with parents for provision of transportation, when not otherwise required by law, at parents' expense). Thus, a duty to provide public transportation is not implicated in the dismissal responsibility of "walking" districts and, under law, such districts can allow students to walk home from school.

Further refining the parameters of the school district's responsibility to provide a safe dismissal environment are the state requirements controlling the timing and posting of crossing guards to assist students when walking to and from school, all of which are municipal law enforcement responsibilities. *See N.J.S.A.* 40A:9–154.1 (governing municipal appointment of school crossing guards); *N.J.S.A.* 40A:9–154.4 (vesting police chief or other chief law enforcement officer with right to position crossing guards within municipality). Decisions about the number and

location of crossing guards affect children's safe passage home, but fall outside the district's control.

Those aspects of dismissal, which are undoubtedly outside the educators' authority, counsel in favor of a clear standard of the school district's duty as we have outlined above, and must be factored into any application of those requirements and the subsequent consideration of reasonableness when applying those requirements in the dismissal context.

## IV.

We now turn to the question whether a jury must decide if defendants breached their duty of care in the supervision of Joseph during dismissal. Although the existence of a duty is a question of law, whether the duty was breached is a question of fact. *See, e.g., Anderson v. Sammy Redd & Assocs.,* 278 *N.J.Super.* 50, 56, 650 *A.*2d 376 (App.Div.1994), *certif. denied,* 139 *N.J.* 441, 655 *A.*2d 444 (1995). This matter is before the Court following defendants' successful motion for summary judgment. Accordingly, the facts must be viewed in the light most favorable to plaintiffs, the non-moving party. *See R.* 4:46–2(c); *Hodges v. Sasil Corp.,* 189 *N.J.* 210, 215, 915 *A.*2d 1 (2007) (citing *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995)). Summary judgment is appropriate if the strength of the record supporting reasonableness of the school district's efforts, when viewed in the light most favorable to plaintiffs, forecloses liability. If the record does not permit summary judgment, the trier of fact must determine whether defendants' conduct was reasonable in light of the totality of the circumstances and, if so, whether Joseph's injury was proximately caused by defendants' breach.

Relevant to a determination of breach, we must consider the reasonableness of defendants' dismissal plan and supervision procedures, the implementation of those procedures on the day of Joseph's injury, and the school's communications with parents concerning dismissal. Here, the principal testified that parents

were informed of early dismissal days in the beginning of the school year and that if a student moved into the district during the year, notice of early dismissal days was included in the registration packet. Plaintiff's father did not recall receiving such information when they moved into the district, and defendant had discarded the evidence that might have verified that it gave notice to plaintiff. Further, the principal testified that she personally supervised early dismissal to "make sure that there were no children whose parents did not pick them up and they were still outside." When viewed in the light most favorable to plaintiff, the sparse record as developed to date in respect of the reasonableness of the school district's efforts may not foreclose liability here. Therefore, a remand is necessary for the trier of fact to consider those issues.

We add only this. Our holding should not be interpreted to suggest that schools are guarantors of students' safety with respect to all activities during or after dismissal. A school district's responsibility has temporal and physical limits, and its obligation to act reasonably does not diminish the responsibilities that parents or guardians have to their children. We caution parents and guardians that their conduct under the circumstances—such as failing to read or heed school notices, advise school authorities of changed conditions, or act reasonably and responsibly in dropping off and picking up children—may be relevant to the analysis of breach. That said, a parent's or guardian's indifference may not absolve a school district of negligence in a given case. Even if parents or guardians overlook their responsibility, educators have a duty of reasonable care that includes the implementation of appropriate dismissal procedures, effective notice to parents or guardians of those procedures, and compliance with parents' instructions, if any, regarding a child's inability to walk home alone. At day's end, the examination whether the school fulfilled that duty is one of reasonableness under the totality of the circumstances.

## V.

Justice Blackmun observed in *New Jersey v. T.L.O.* that educators have an obligation "not just to maintain an environment conducive to learning, but to protect the very safety of students and school personnel." 469 *U.S.* 325, 353, 105 *S.Ct.* 733, 748, 83 *L.Ed.*2d 720, 742 (1985) (Blackmun, J., concurring in judgment). As the school-time trustees of our most cherished and vulnerable citizens, educators have the responsibility to protect the children in their care. Regarding dismissal, that responsibility is discharged through the school district's adoption of reasonable dismissal practices, proper and demonstrable notice to parents or guardians of the practices, and effective compliance with those practices and appropriate requests received from parents or guardians concerning dismissal.

Because this appeal presents factual questions whether defendants breached that duty and whether such a breach proximately caused Joseph's injuries, we remand the matter to the trial court for further proceedings consistent with this opinion. The judgment of the Appellate Division is affirmed as modified.

*For affirmance as modification/remandment*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.