NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1797-21
                A-1943-21

FUNTOWN PIER AMUSEMENTS,
INC.,

       Plaintiff-Respondent,

v.

BISCAYNE ICE CREAM
AND ASUNDRIES, INC., KOHR'S
ICE CREAM INC., OCEAN
COUNTY, BARRY LATHROP, d/b/a
AA-LEK-TRIK, JOHN
HELMSTETTER, d/b/a JOHN
HELMSTETTER ELECTRICAL
CONTRACTOR, and FUNTOWN
PIER ASSOCIATES,

       Defendants,

and

JERSEY CENTRAL POWER
& LIGHT, a/k/a FIRST ENERGY,

       Defendant-Respondent.

_____

DELANEY ENTERPRISES,

       Plaintiff-Appellant,

and

| | |
|---|---|
| **APPROVED FOR PUBLICATION** | |
| **January 9, 2024** | |
| **APPELLATE DIVISION** | |

JOHN SUNDERMAN,

     Plaintiff-Respondent,

v.

FUNTOWN PIER ASSOCIATES, ANTHONY HANSEN, d/b/a BISCAYNE CANDY, BRUCE KOHR, d/b/a KOHRS CUSTARD, FIRST ENERGY CORPORATION, d/b/a JCP&L, BOROUGH OF SEASIDE PARK, and COUNTY OF OCEAN,

     Defendants-Respondents.

_____

BELLE FREEMAN PROPERTIES, LLC, SEASIDE HOLDING CO, LLC, JOSEPHINE PASCARELLA, d/b/a SURF & SON LLC, TINA PANAS, d/b/a BERKELEY CANDY, ANGELA CAPPETTA, d/b/a ROYAL ARCADE, and JOHN E. LIVINGSTON TAX SHELTER TRUST,

     Plaintiffs-Appellants,

v.

FUNTOWN PIER ASSOCIATES, ANTHONY HANSEN, d/b/a BISCAYNE CANDY, BRUCE KOHR, d/b/a KOHRS CUSTARD, FIRST ENERGY CORPORATION, d/b/a JCP&L, BOROUGH OF SEASIDE PARK, and COUNTY OF OCEAN,

2

A-1797-21

Defendants-Respondents.

_____

Argued November 14, 2023 – Decided January 9, 2024

Before Judges Rose, Smith, and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-2438-15.

Peter H. Wegener argued the cause for appellant Funtown Pier Amusements, Inc. (Bathgate, Wegener & Wolf, PC, attorneys; Ryan S. Malc, of counsel and on the briefs).

Ronald S. Gasiorowski argued the cause for appellants Belle Freeman Properties, Inc., Seaside Holding Co., LLC, Josephine Pascarella, d/b/a Surf & Son, LLC, Tina Panas, d/b/a Berkeley Candy, Angela Cappetta, d/b/a Royal Arcade, John E. Livingston Tax Shelter Trust, and Delaney Enterprises (Gasiorowski & Holobinko, attorneys; Ronald S. Gasiorowski, on the briefs).

Michael Thomas Kearns argued the cause for respondent Jersey Central Power & Light (Hoagland, Longo, Moran, Dunst & Doukas, LLP, attorneys; Michael Thomas Kearns, of counsel; Dawn Patricia Marino, on the briefs).

The opinion of the court was delivered by

SMITH, J.A.D.

In these consolidated appeals, we consider the boundaries of an electric utility's duty to exercise reasonable care to prevent risk of harm to its

customers while it worked to restore power in the aftermath of Hurricane Sandy.

Plaintiffs appeal the Law Division's January 19, 2022 orders granting summary judgment in favor of defendant JCP&L. After a post-Hurricane Sandy boardwalk fire in Seaside Heights, plaintiffs sued multiple defendants for damages, including JCP&L. They alleged various negligence and fraud theories. An investigation revealed that the fire originated underneath the boardwalk in storm-damaged electrical service equipment that was privately owned. The trial court found plaintiffs' expert rendered a net opinion on the question of JCP&L's duty. Among other things, it concluded plaintiffs failed to establish that JCP&L owed its business customers a duty of care to inspect their privately owned electric service equipment in the aftermath of storm damage caused by Hurricane Sandy. Because JCP&L had no existing duty of care to inspect customer-owned equipment and newly recognizing such a duty would go against principles of fairness and public policy, we affirm.

I.

Mindful that we resolve all factual disputes in favor of the non-moving party on summary judgment, see Crisitello v. St. Theresa Sch., 255 N.J. 200, 218 (2023), we recount the salient history. On October 29, 2012, Hurricane Sandy struck New Jersey and caused extensive damage across the state,

including the barrier islands.  JCP&L,[1] the utility provider for the region, cut power to the area's approximately 30,000 customers.  Many municipalities, including Seaside Park, removed electrical meters from commercial businesses and residences in anticipation of the storm.

After the storm, JCP&L issued a "fact sheet" for its customers, specifying requirements for restoring electrical service and providing safety tips and warnings about post-storm risks such as hidden electrical hazards.  To re-energize, or restore electrical service, the fact sheet instructed customers to have a "qualified" electrician assess damage to electrical equipment, discard any damaged devices, and obtain a permit to complete any necessary repairs.[2]  Upon completion of these tasks, the repairs were to be approved by a state inspector.

---

[1]  Throughout the record, the public utility JCP&L is interchangeably referred to as First Energy Corp.  For consistency's sake, we use the name JCP&L in this opinion.

[2]  Utility-owned equipment consists of the side of the transformer facing the source of power, the poles, back to the substation, and ultimately to the transmission grid.  This is considered the "primary side."  The customer-owned equipment is called the "secondary side," which consists of the service wire running from the pole to the underground wires running into the customer's building and into the main electrical panel.  It is also referred to as the "load" side, or "downstream."  Where the service is underground, as the record shows here, the customer owns the wires "downstream" of the transformer.  JCP&L owns the meter while the customer owns the meter pan.

A-1797-21

The state inspector was responsible for certifying to JCP&L that repairs were done properly and that it was safe to restore electrical service. The inspector communicated with the utility by using a cut-in card.[3] The cut-in card verification process is used by all electrical utilities in New Jersey, even for non-storm related repairs.

After the storm, the New Jersey Department of Community Affairs hired additional licensed electrical inspectors to assist approximately 10,000 customers who sought to restore power in Seaside Park, Brick, and Toms River. The record shows the inspectors were required to ensure any post-storm electrical repair work on commercial or residential property was performed according to approved plans and in compliance with the electrical code. Inspectors also checked customer buildings to approve newly installed equipment or to determine whether externally mounted pre-existing equipment needed replacement. Once the inspector was satisfied that the customer's repaired or newly installed equipment met code, the inspector signed the cut-in card, and the municipality then transmitted the signed card to the utility.

---

[3] The cut-in card used is a standard form required by the Uniform Construction Code. N.J.A.C. 5:23-4.5(b)(2). A cut-in card collects the address, owner, and occupant of the property to be energized, as well as the description of the electric service requested, the installer, the inspector, and the inspection date. It certifies "installation in the above premises has been inspected in accordance with [National Electric Code (NEC)] and [New Jersey Department of Community Affairs (DCA)] requirements."

JCP&L's receipt of the cut-in card was its confirmation that it was safe to reenergize the customer's power lines. JCP&L would not energize power lines for a customer's location until a corresponding cut-in card was issued.

In April 2013, the owners of the Biscayne building sought to restore the power to their building. They hired a private licensed electrician, Barry Lathrop of AA-Lek-Trik, to inspect the building's electrical wiring. Lathrop testified that he inspected the Biscayne building's wiring and related components, which were located under the boardwalk. He emptied water from the junction box, cleaned and re-spliced wires, and concluded no additional work or replacement was needed. On May 1, 2023, Lathrop installed service cables from JCP&L's power source to the electric meters for Biscayne Candy and Kohr's Frozen Custard.

On May 20, 2013, the state's inspector, Richard Van Wert, issued and signed a cut-in card for the Biscayne building, which was sent to JCP&L. Inexplicably, he issued and signed the card before completing the actual inspection. Eight days after issuing the card, on May 28, 2013, Van Wert finally reviewed and approved the electrical service and equipment at the Biscayne building. He concluded that "it was safe for JCP&L to energize the building." The actual approval appears to have occurred after the building was

reenergized, as the record shows the Biscayne building received power on May 23 or May 24, 2013.

A fire was reported on September 12, 2013. The call came in at approximately 2:20 p.m., and it reported the location of the fire as 1800-1803 Boardwalk in Seaside Park. This address houses two businesses: Kohr's Frozen Custard and Biscayne Candies. Witnesses said they saw smoke coming from the boardwalk in front of Kohr's. The fire quickly spread to numerous boardwalk properties, causing substantial damage.

Detective Thomas Haskell of the Ocean County Prosecutor's Office investigated the fire and reported that "[t]hrough the process of elimination the one item we could not eliminate was a malfunction or failure to energize the electrical power."

On September 1, 2015, Funtown Pier Associates sued Biscayne Ice Cream, Khor's, Seaside Park, JCP&L, Ocean County, and various John Does. Funtown's complaint alleged negligence and fraud against multiple defendants. Pertinent here, count six alleged negligence against JCP&L. Funtown alleged JCP&L had a duty, as the utility responsible for supplying electricity to the Seaside Park boardwalk, to inspect beneath the boardwalk and ensure the superstorm had not compromised customer-owned equipment before reenergizing. According to the complaint, JCP&L breached that duty by

failing to inspect beneath the boardwalk itself and failing to obtain proper inspection permits and approvals certifying that "the electrical components underneath the boardwalk were sufficiently removed and/or protected" in order to prevent fires.

Belle Freeman Properties, LLC, Seaside Holding Co, LLC, Josephine Pascarella d/b/a Surf & Son LLC, Tina Panas d/b/a Berkeley Candy, Angela Cappetta d/b/a Royal Arcade, and John E. Livingston Tax Shelter Trust, sued JCP&L on September 10, 2015, alleging it negligently reenergized their boardwalk properties without proper inspection. The two lawsuits were ultimately consolidated with five other lawsuits[4] alleging negligence against JCP&L.

Plaintiffs retained an expert, Christopher Graham, P.E. Graham authored a report, dated January 31, 2019, which contained two opinions relevant here: first, JCP&L failed to inspect or replace wires and electrical components that were submerged in saltwater; second, JCP&L did not follow accepted practices by energizing Biscayne and Kohr's in the presence of hazardous conditions.

---

[4] The other suits were Delaney Enterprises, Docket No. OCN-L-2546-15, John Verderosa, et al, Docket No. OCN-L-2573-15, Lexington Insurance Co.,et al, Docket No. OCN-L-1295-15, Scottsdale Insurance Co., et al, Docket No. OCN-L-1489-16, and Executive Risk Specialty Ins., et al, Docket No. OCN-L-3123-16.

During his two-day deposition, Graham testified regarding the basis for his opinions. He acknowledged there were no industry "standards" which JCP&L failed to follow. Graham also testified that none of the business practices of the entities he named in his report[5] would have required JCP&L to inspect customer-owned equipment potentially damaged by saltwater. He acknowledged that he could point to no state law, regulation, or industry standard establishing a duty to inspect customer owned equipment.

Graham opined that the source of the fire was "the wiring and conductors and components and J-boxes underneath the floorboards at Kohrs and Biscayne building." Graham admitted the fire was not caused by a failure of JCP&L equipment.

After discovery, JCP&L moved to bar plaintiffs' expert and for summary judgment. After the motion was filed, plaintiffs produced a supplemental report from Graham, which stated, "in light of what JCP&L knew about the storm . . . JCP&Ls failure to verify that all customer-owned equipment was inspected was a breach of their duty to act reasonably." The trial court granted both motions and issued a detailed statement of reasons.

---

[5] DCA, JCP&L, the National Electrical Manufacturers Association, PECO Energy, and Electrical Safety Foundation International are listed in Graham's July 21, 2021 report. Graham makes references to other electric utilities which are not identified in the record before us.

A-1797-21

The court found Graham failed to identify any duty breached by JCP&L, and further concluded his expert testimony was a net opinion. Finding plaintiffs could not establish a duty on the part of JCP&L to inspect customer-owned equipment prior to reenergizing the building, the motion judge granted summary judgment in favor of JCP&L.

On appeal, the plaintiffs raise multiple arguments, including: the court erred in finding electrical utility companies do not have a duty to investigate damaged customer equipment when hazardous conditions exist; and JCP&L's actions in reenergizing the power at the Biscayne building, based on the bogus cut-in card, compel the imposition of an enhanced duty on the utility.

Distilled to their essence, plaintiffs' arguments collectively focus on the scope of the duty of care JCP&L owed to its electric customers on the boardwalk. The dispositive question before us is: whether JCP&L had an independent duty to ensure that customer owned equipment, submerged beneath the Biscayne building due to Hurricane Sandy, was safe by performing independent inspections.

II.

A.

"We review a trial court's grant of summary judgement de novo, applying the same standard as the trial court." Hyman v. Rosenbaum Yeshiva

of North Jersey, 474 N.J. Super. 561, 572 (App. Div. 2023), certif. granted, 255 N.J. 419 (Oct. 6, 2023). That standard is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 251-52 (1986)). "Summary judgment must be granted 'if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Hyman, 474 N.J. Super at 572 (quoting Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016)).

B.

"To sustain a cause of action for negligence, a plaintiff must establish: (1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages." T.B. v. Novia, 472 N.J. Super. 80, 94 (App. Div. 2022), leave to appeal denied, 251 N.J. 214 (2022) (citing Townsend v. Pierre, 221 N.J. 36, 51 (2015)). We focus on the first element of a negligence claim, the duty of care.

"It is well settled that whether a party owes a duty to another party is a question of law for the court to decide." Rivera v. Cherry Hill Towers, LLC,

474 N.J. Super. 234, 240 (App. Div. 2022) (citing Robinson v. Vivirito, 217 N.J. 199, 208 (2014)). "Whether, in a given context, 'a duty to exercise reasonable care to avoid the risk of harm to another exists is [a question] of fairness and policy that implicates many factors.'" Coleman v. Martinez, 247 N.J. 319, 337 (2021).

"[I]n all duty-of-care determinations, a 'court must first consider the foreseeability of harm to a potential plaintiff and then analyze whether accepted fairness and policy considerations support the imposition of a duty.'" Id. at 338 (quoting Jerkins v. Anderson, 191 N.J. 285, 294 (2007)). In other words, foreseeability is an essential nexus to establish the scope of the duty owed by an alleged tortfeasor.

A finding of foreseeability, however, does not end the inquiry. Foreseeability "does not in itself establish the existence of a duty." Id. at 342 (quoting Jerkins, 191 N.J. at 295). "[B]ecause imposing a duty based on foreseeability alone could result in virtually unbounded liability, [courts] have been careful to require that the analysis be tempered by broader considerations of fairness and public policy." Estate of Desir ex rel. Estiverne v. Vertus, 214 N.J. 303, 319 (2013). "[T]o evaluate . . . the relevant fairness and policy considerations at issue, [the Supreme Court] has adopted a test that requires 'identifying, weighing, and balancing several factors—the relationship of the

13

parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.'" Coleman, 247 N.J. at 338 (quoting Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993)). Accordingly, "all considerations must be balanced 'in a "principled" fashion, leading to a decision that both resolves the current case and allows the public to anticipate when liability will attach to certain conduct.'" Ibid. (quoting G.A.-H v. K.G.G., 238 N.J. 401, 414 (2019)).

C.

In determining the scope of JCP&L's duty of care, we look first to the Board of Public Utilities (BPU) and its regulations contained in the administrative code. N.J.A.C. 14:1-1.1. The regulations impose a duty upon utility companies to "furnish safe, adequate and proper service, including furnishing and performance of service in a non-discriminatory manner." N.J.A.C. 14:3-3.1(a). They also provide that "[e]ach utility shall inspect its equipment and facilities at sufficiently frequent intervals to disclose conditions, if existing, which would interfere with safe, adequate and proper service, and shall promptly take corrective action where conditions disclosed by such inspection so warrant." N.J.A.C. 14:3-2.7(a).

Prior to offering services to the public, each public utility must submit a tariff to the BPU for approval. See N.J.A.C. 14:3-1.3(a), (d); N.J.A.C. 48:2-

14

21. A utility's tariff is a public document which sets forth the services it offers, the rates and fees it will charge its customers for those services, and the rules, regulations and practices which govern those services. See International Tel. and Tel. Corp. v. United Tel. Co. of Fla., 433 F. Supp. 352, 357 (M.D. Fla. 1975), aff'd, 550 F.2d 287 (5th Cir. 1977). "A tariff is . . . filed by a public utility, and thereafter, in the absence of successful challenge, applicable equally to all customers." In re Saddle River, 71 N.J. 14, 29 (1976). "[A] tariff is not a mere contract. It is the law, and its provisions are binding on a customer whether he knows of them or not." Ibid.

With this foundation in place, we review the pertinent sections of JCP&L's tariff.

Section 4.10 of JCP&L's tariff is titled, "Liability for Supply or Use of Electric Service." It states in pertinent part: "[JCP&L] will not be responsible for the use, care, condition, quality or handling of the [s]ervice delivered to the Customer after same passes beyond the point at which the Company's service facilities connect to the Customer's wires and facilities."

Section 5.02, titled "Service Entrance," clearly defines the equipment for which the customer is responsible: "[w]ith the exception of metering equipment and related facilities furnished by the Company, all of the facilities

15

necessary to conduct electricity from the point of delivery to the Customer's circuits shall be installed, owned and maintained by the Customer."

Section 5.03, titled "Inspection and Acceptance," states "[JCP&L] may refuse to connect with any [c]ustomer's installation . . . when such installation is not in accordance with the [NEC],[6] or where a certificate approving such installations has not been issued by an electrical inspection authority."

Section 5.07, titled "Liability for Customer's Installation," states, "[JCP&L] will not be liable for damages . . . sustained by . . . the equipment or property of [the] [c]ustomer . . . by reason of the condition, character, or operation of the [c]ustomer's wiring or equipment . . . ."

Governor Chris Christie imposed an additional duty on October 27, 2012. His Executive Order No. 104 charged JCP&L with the duty to provide safe, adequate, and proper electric service to emergency service providers in Sandy's immediate aftermath.

A utility company's tariff, as approved by the BPU, necessarily plays a significant role in establishing the company's duty to exercise reasonable care to avoid the risk of harm to its customers. Having examined JCP&L's tariff, we note it imposes no duty to inspect customer electrical equipment, nor does

---

[6] The NEC is a set of regularly updated industry standards for the safe installation of electric wiring in the United States. The code is promulgated by the National Fire Protection Association.

it impose a duty to supervise third party repair work on customer owned equipment. Relevantly, Section 5.07 states JCP&L will not be liable to customers for damage caused by the customer's faulty equipment or property. Finally, JCP&L's tariff imposes no duty to cross-check the work of state-licensed electrical inspectors.

## III.

## A.

We first address whether the motion judge erred in barring Graham's expert testimony. Graham testified that his opinion was supported by "guidelines issued by JCP&L" and other business entities, referencing what equipment "should be inspected after a flood or a storm surge of this magnitude." Expanding upon Graham's supplemental report in its merits brief, Funtown argues that JCP&L, charged with knowledge of the storm's effect on submerged electrical equipment, had a duty to exercise care commensurate with the foreseeable risks associated with the storm, such as corroded equipment and fire. Funtown further argues that JCP&L should have fulfilled that duty by not reenergizing the Biscayne building when it knew or should have known that a dangerous electrical condition existed under the boardwalk.

"The admission or exclusion of expert testimony is committed to the sound discretion of the trial court." Townsend v. Pierre, 221 N.J. 36, 52-53

17

(2015) (citing State v. Berry, 140 N.J. 280, 293 (1995)). "Appellate review of the trial court's decisions proceeds in the same sequence, with the evidentiary issue resolved first, followed by the summary judgment determination of the trial court." Id. at 53 (citing Estate of Hanges v. Metro. Prop. & Cas. Ins., 202 N.J. 369, 385 (2010)).

We consider the admissibility of Graham's expert testimony evidence under N.J.R.E. 702 and 703. N.J.R.E. 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

N.J.R.E. 703 states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the proceeding. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Applying these rules, the Supreme Court has held that expert opinions are inadmissible if they constitute "net opinions," that is, opinions that constitute "bare conclusions, unsupported by factual evidence." Buckelew v. Grossbard, 87 N.J. 512, 524 (1981). The net opinion rule follows from

18

N.J.R.E. 703's requirement that expert opinions be supported by facts or data. Townsend, 221 N.J. at 53-54; Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 410 (2014). The rule "mandates that experts 'be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable.'" Townsend, 221 N.J. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)). "Given the weight that a jury may accord to expert testimony, a trial court must ensure that an expert is not permitted to express speculative opinions or personal views that are unfounded in the record." Ibid.

At the same time, the net opinion rule "is not a standard of perfection." Id. at 54. Moreover, the rule does not mandate that an expert support his or her opinion in a manner that the opposing party would prefer, nor does it require that an expert give weight to all facts the opposing party deems relevant. Ibid.; In re Civil Commitment of A.Y., 458 N.J. Super. 147, 169 (App. Div. 2019).

Applying these principles, we discern no error in the trial court's conclusion that Graham's testimony constituted a net opinion. While Graham issued an opinion stating JCP&L violated unspecified industry "guidelines," his report failed to cite the foundation for his conclusion. Graham also conceded at his deposition that no industry standard required inspection of

19

customers equipment for hazards. We note JCP&L provided customers a fact sheet which informed them about the hazardous conditions expected after the storm as well as detailed instructions for restoring power. The record shows JCP&L restored power to the Biscayne building after receiving the cut-in card provided by licensed state electrical inspectors. The record also shows that, regardless of whether they did so before or after the cut-in card was sent to JCP&L, the inspectors reviewed and approved the repair work done at the Biscayne building nearly four months before the fire occurred.

"A party's burden of proof on an element of a claim may not be satisfied by an expert opinion that is unsupported by the factual record or by an expert's speculation that contradicts that record." Townsend, 221 N.J. at 55. Graham provided no factual or methodological support for the proposition that JCP&L had a duty to act, or refuse to act, in a manner different than it actually did. He did not identify evidence of what industry standard JCP&L failed to follow, or how JCP&L did not comply with legal standards. Given that Graham could not testify to a standard of care, he "was in no position to express more than his personal opinion. A standard that is personal to the witness is equivalent to a net opinion." Crespo v. McCartin, 244 N.J. Super. 413, 423-24 (App. Div. 1990) (citing Fernandez v. Baruch, 52 N.J. 127, 131 (1968)). "Such an opinion provides no assistance to the trier of fact." Ibid. We conclude the trial

court did not abuse its discretion when it barred Graham's expert testimony as an inadmissible net opinion.

B.

We next consider plaintiff's statutory argument that JCP&L had a duty to inspect the underground wires leading to the Biscayne building pursuant to the Underground Facility Protection Act (UFPA), N.J.S.A. 48:2-73 to 91.

N.J.S.A. 48:2-75, the definitional section of the UFPA, states:

> 'Underground facility' means any public or private personal property which is buried, placed below ground, or submerged on a right-of-way, easement, public street, other public place or private property and is being used or will be used for the conveyance of water, forced sewage, telecommunications, cable television, <u>electricity</u>, oil, petroleum products, gas, optical signals, or traffic control, or for the transportation of a hazardous liquid . . . but does not include storm drains or gravity sewers.
>
> [Emphasis added].

A plain reading of the text shows the Biscayne building's electrical equipment beneath the boardwalk is an underground facility per the UFPA.

Plaintiffs next cite N.J.S.A. 48:2-80(b) of the UFPA for the proposition that it "imposes a legal duty to inspect and oversee maintenance of any electric lines that [JCP&L] may 'own, operate, or control . . . .'" (Emphasis deleted). Section 2-80(b) states in pertinent part: "[i]f an operator does not own, operate or control any underground facilities at the site [for] which [they] received

21

information of a notice of intent to excavate . . . the operator[7] shall make a reasonable effort to so advise the person giving notice of intent to excavate . . . ."

Plaintiffs argue section 2-80(b), read together with the Supreme Court's holding in Jersey Central Power & Light Company v. Melcar Utility Company, 212 N.J. 576 (2013), support the theory that the UFPA created a "duty" on the part of JCP&L to inspect and oversee electrical lines running between the utility pole and the meter attached to the Biscayne building. We are not persuaded.

N.J.S.A. 48:2-80(b) has a narrow focus and application. It imposes a duty on underground facility operators who receive an excavation notice for an underground facility they do not <u>own</u>, <u>operate</u>, or <u>control</u>, to inform the excavator that they have notified the wrong facility owner, nothing more. <u>Id.</u> Plaintiffs' citation of <u>Jersey Central Power & Light Company v. Melcar</u> adds nothing more to their theory, as it held that the UFPA's mandatory arbitration clause, N.J.S.A. 48:2-80(d), was unconstitutional, and did not vitiate a utility company's state constitutional right to trial by jury in the company's negligence suit for damages against an excavator. 212 N.J. at 600. Plaintiffs

---

[7] The UFPA defines "operator" as " a person owning or operating , or controlling the operation of, an underground facility. . . ." The definition excludes residential homeowners. N.J.S.A. 48:2-75.

have pointed to nothing in the record that would cause us to read the UFPA, or any other statute or regulation for that matter, as imposing a duty on JCP&L to inspect customer owned electrical equipment. This argument has no merit.

C.

We turn next to plaintiffs' contention that our jurisprudence imposes on JCP&L the duty to inspect customer owned-electrical equipment.

Plaintiffs' reliance on cases such as Hoboken Land & Improvement Co. v. United Electric Co. of New Jersey, 71 N.J.L. 430 (1904), are not persuasive. In Hoboken, the court upheld a finding of negligence against a power company when a hired contractor improperly installed the electric meter resulting in a fire. Id. at 430-431. However, Hoboken considered the power company's duty to inspect the work of a contractor it hired to install its own equipment. As the crux of this case is customer-owned equipment, not utility-owned equipment, this case is inapplicable.

Plaintiffs also rely on Osar v. PSE&G, 8 N.J. Misc. 260, 261 (N.J. 1930), a case in which an explosion resulted after the gas company did not inspect the interior of a home before restoring service. However, this case undermines plaintiffs' argument, as the Osar court acknowledged the general rule that "in the absence of any fact upon which to base an inference of duty, the failure of a gas company, on introducing gas into a dwelling upon

23

application, to inspect pipes or fixtures which were placed therein by the owner and over which the company has no control, is not negligence." Ibid.

Plaintiffs have failed to show any caselaw which establishes a duty on the part of a utility company to inspect customer-owned electrical equipment.

D.

Satisfied that no existing duty to inspect customer equipment exists, we consider whether to recognize a new one, given plaintiffs' arguments. We must first examine "the foreseeability of harm to a potential plaintiff," and then consider "whether accepted fairness and policy considerations support the imposition of a duty." Coleman, 247 N.J. at 338.

We turn to the question of whether the extant danger, structural fire caused by electrical components damaged during Hurricane Sandy, was foreseeable. We have long recognized that the nature of the risk accompanying electric power generation is great. See Anderson v. Jersey City Elec. Light Co., 63 N.J.L. 387 (1899) (holding that the use of electricity requires a high degree of care). The parties do not dispute that the risk of electrical fire caused by storm damaged components malfunctioning upon re-energization was significant. The record on this point is substantial. In the lead up to Hurricane Sandy, Governor Christie issued an evacuation of barrier islands and municipal officials ordered thousands of meters removed in

24 <span>A-1797-21</span>

anticipation of damage to energy infrastructure. JCP&L published detailed customer instructions designed to ensure customer-led repairs and state-sanctioned electrical inspections were completed before re-energization prior to the May 2013 tourist season. We can safely conclude the risk of harm resulting from hazardous conditions created by electrical equipment being submerged in water was foreseeable.

Since "imposing a duty based on foreseeability alone could result in virtually unbounded liability," Desir, 214 N.J. at 319, we next consider the fairness and policy implications. Before imposing a new duty on an electric utility, a court should balance: the parties' relationship to each other; the nature of the risk to be shifted; the utility's opportunity and ability to exercise care; and the public interest in the proposed solution. Coleman, 247 N.J. at 338.

We analyze the factors outlined in Coleman. The relationship between a public utility and its customers is subject to substantial oversight. The comprehensive statutory and regulatory scheme in place, including an electric utility's BPU-approved tariff, militates against our creation of a common law duty to inspect customer-owned equipment on this record.

We next consider JCP&L's ability and opportunity to exercise care. Plaintiff asks us to require JCP&L to inspect customer owned equipment.

Imposing such a duty would reach far beyond the obligations the State has placed on utilities. JCP&L follows the National Electric Safety Code (NESC), which was adopted by the BPU under N.J.A.C 14:5-1.1. The NESC does not require utility companies to inspect customer equipment. There are no facts in the record that suggest JCP&L's procedure to re-energize affected communities diverged from industry standards. It is not alleged that JCP&L re-energized properties without receiving a cut-in card signed by a municipal inspector. The duty proposed by plaintiffs would create a new obligation for JCP&L to essentially double check the work of every electrician and municipal inspector before transmitting power. The care required to conform with this duty would, in our view, cut against principles of fairness.

The proposed duty is also not in the public interest. JCP&L's expert, Richard Brown, testified that the municipal inspector handles customer-owned equipment from where service connection starts at the JCP&L transformer to the meter panel. Regarding whether, in post-hurricane conditions, the utility should be charged with a heightened duty to inspect customer-owned equipment before re-energizing, Brown explained that JCP&L doesn't employ licensed electrical inspectors. Ultimately, plaintiffs' proposed duty would require utility companies to hire additional personnel to conduct redundant inspections after a municipal inspector has already determined that a location

is safe to energize. Plaintiffs have failed to show their proposed solution of the utility hiring inspectors to check the work of the municipal inspectors is more workable or appropriate than other potential solutions. Creating a redundant system of inspection, perhaps to be activated only after large-scale "superstorms," would undermine a utility company's responsibilities as defined in its tariff, create jurisdictional confusion between private-sector utility electrical inspectors and state-sanctioned municipal electrical code officials, and leave the question of when to apply this enhanced duty to post-hoc storm damage assessments. We perceive no benefit to the public when the proposed expansion of a public utility's duty raises concerns such as these.

Finally, plaintiffs' argument that it is in the public's interest to expand the liability of public utilities is not persuasive. In this era of rapid climate change, the future risk of "superstorms" striking New Jersey's coast and causing damage to electric utility infrastructure is significant. See Ning Lin et al., Hurricane Sandy's Flood Frequency Increasing From Year 1800 to 2100, Proceedings of the National Academy of Sciences, October 10, 2016 (https://doi.org/10.1073/pnas.1604386113). As a matter of public policy, we conclude an expansion of JCP&L's duty to inspect to include redundant inspections of customer-owned equipment would place an unfair burden on the

A-1797-21

utility and its ratepayers, making them insurers for the negligent acts or omissions of others.

We recognize the unusual circumstances of Hurricane Sandy which led to plaintiffs' claims and their contention that such circumstances warrant an enhanced duty on the part of the electric utility, an entity which arguably possesses more resources than individual businesses or municipalities to cope with extreme weather events.  However, in an era likely to include more extreme weather events, not less, clarity in establishing the duty of care for public utilities towards their customers is paramount, so that the public utility "can anticipate when liability will attach to certain conduct."  Coleman, 247 N.J. at 338.  We thus decline plaintiffs' invitation to create a new legal duty for JCP&L, with its attendant consequences.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION