886 A.2d 633

MIHAELA CREANGA AND RADU CREANGA, PLAINTIFFS–APPELLANTS, v. JOHN R. JARDAL, JR., AND LUCENT TECHNOLOGIES, DEFENDANTS–RESPONDENTS.

Argued October 12, 2005—Decided December 8, 2005.

*Gerard J. Martillotti* argued the cause for appellants (*Davis & Martillotti,* attorneys; *Mr. Martillotti* and *Stephanie A. Gahagan,* on the brief).

*Thomas M. Madden* argued the cause for respondents (*Hack, Piro, O'Day, Merklinger, Wallace & McKenna,* attorneys).

Justice ZAZZALI delivered the opinion of the Court.

Plaintiff Mihaela Creanga claims that an automobile accident was the proximate cause of her premature labor and the resultant death of one of her twins. In support of her claim, she offered the expert opinion of her treating physician who stated that the accident caused the miscarriage. He based that opinion on a differential diagnosis of plaintiff's injury, that is, he identified the accident as the proximate cause of plaintiff's injury after the elimination of other alternatives. In reaching his conclusion, the physician considered various factors including his treatment of plaintiff before, during, and after the premature labor and plaintiff's medical records.

Prior to trial, defendants filed a motion to preclude the physician's testimony, arguing that it was a "net opinion," which is an opinion based on bare conclusions untethered to facts. The trial court granted defendants' motion and dismissed the complaint. The Appellate Division affirmed. We, however, conclude that an expert opinion derived from a differential diagnosis is admissible under the New Jersey Rules of Evidence. As applied here, the

physician's expert testimony was based on a properly conducted differential diagnosis. We also hold that the physician's opinion is not a net opinion, and, therefore, the lower courts improperly excluded his testimony. As a result, we reverse and remand the matter to the trial court for reinstatement of the complaint.

I.

According to plaintiff's deposition testimony, on the morning of September 29, 2000, while operating a car that was stopped at a traffic light on Route 70 in Cherry Hill, she was struck from behind by a van owned by Lucent Technologies and driven by an employee of Lucent. Plaintiff was wearing a seat belt when the accident occurred. She stated that, on impact, "it was like my whole body went up, you know, forward." Plaintiff was thirty-six years old at the time and twenty-four weeks pregnant with twin boys. When her car was struck, she was en route to her job as a medical assistant in the office of Dr. Klessa. After the accident, plaintiff continued on to work. While at work she began feeling some discomfort and was examined by Dr. Klessa who adjusted her neck and checked her vital signs.

Two days after the accident, at about noon on October 1, 2000, plaintiff experienced contractions and vaginal bleeding. Plaintiff believed that she was in labor and, at around 2:00 p.m., she went to the emergency room at Kennedy Memorial Hospital in Stratford. On arrival, plaintiff was treated by a resident doctor who determined that she was in labor and attempted to stop the delivery. That doctor called in her regular physician, Dr. Faramarz Zarghami, to assist in plaintiff's care and treatment. Dr. Zarghami attempted to stop delivery of the twins, but, despite those efforts, plaintiff gave birth to one of the twins, who died almost immediately after delivery. Dr. Zarghami was able to halt delivery of the second baby who subsequently was born healthy. At a postpartum visit, Dr. Zarghami informed plaintiff that he believed that the premature delivery was "from the car accident."

Plaintiff commenced an action against Lucent and the Lucent driver-employee in which she alleged that the accident was the cause of death of the fetus. In preparation for trial, plaintiff conducted a videotape *de bene esse* deposition of Dr. Zarghami, her treating physician and expert witness. Because Dr. Zarghami's opinion is at the core of both issues in this appeal, we provide a detailed review of his testimony.

At his deposition, Dr. Zarghami testified on direct-examination that plaintiff is "a very healthy person" whom he had seen on multiple occasions in relation to her pregnancy. He examined her on September 27, 2000, two days before the accident, and determined that her condition was normal. More specifically, he stated that at the time of that examination

her blood pressure was okay, a urine exam was normal, she had no swelling or edema, her uterus for a single pregnancy should have been 24 for her size, it was 27 sonometers, which is related to the twin pregnancy, I heard the fetal heart tone, and she offered no complaint in terms of contraction or bleeding or discharge.

Two days after the accident, on October 1, 2000, Dr. Zarghami was called to the hospital to assist and care for plaintiff because she was in premature labor. He participated in the delivery of one of the twins who, according to the doctor, was born alive and "probably gasped one or two times and then [stopped] breathing." The other twin remained inside the womb and, after receiving permission from plaintiff, the doctors closed plaintiff's open cervix so that she could continue that pregnancy.

After the surgery, Dr. Zarghami reviewed plaintiff's history with her in an effort to determine what caused the miscarriage. At that time, plaintiff told Dr. Zarghami that she had been in a car accident two days earlier. Dr. Zarghami explained that, in reaching his conclusion that the accident caused the miscarriage, he "tried to rule out the other causes of premature labor like preeclampsia, high blood pressure, any trauma or accident, [or] any infective cause to cause infection and premature labor." The only cause that remained for the premature labor was "trauma of the accident." He concluded: "With a reasonable degree of medical

certainty, yes, I think [the trauma of the accident was] probably the cause of her premature labor."

On cross-examination, defendants questioned Dr. Zarghami concerning whether the miscarriage was in fact the result of an incompetent cervix rather than the accident as he had concluded. When asked to define "cervical incompetence," Dr. Zarghami explained that it means that the cervix "is not able to hold the pregnancy." Counsel then asked whether plaintiff's family history, particularly the fact that her mother had an incompetent cervix and eleven miscarriages, made it more likely that she had suffered from an incompetent cervix. Dr. Zarghami responded that plaintiff's family history was irrelevant because she did not have an incompetent cervix when she gave birth to her first child. He also explained that an incompetent cervix is not more likely to occur with twins because "[t]wins are more prone to premature labor, not incompetent cervix." He added that plaintiff's three prior abortions did not have an impact on the premature labor. When asked if premature labor and incompetent cervix are in any way related, Dr. Zarghami explained that they are two different medical conditions. Premature labor is usually associated with contractions, but births resulting from an incompetent cervix generally do not involve contractions. The only relationship, he testified, is that when a woman has an incompetent cervix and commences premature labor she will deliver faster.

Dr. Zarghami acknowledged that he had signed the preoperative diagnosis report, which stated that the cause of plaintiff's premature labor was an incompetent cervix, not an automobile accident. He explained that the report was prepared by a resident physician, not by him, and that he had never written "anything in terms of incompetent cervix" on plaintiff's chart. Dr. Zarghami also acknowledged that the preoperative diagnosis report did not mention that there was an automobile accident. Counsel then directed Dr. Zarghami's attention to plaintiff's discharge summary that was prepared and signed by him. In that summary there is a postoperative note, prepared and signed by

the resident that, like the preoperative report, diagnosed an incompetent cervix. Dr. Zarghami explained that he disagreed with that diagnosis because the other twin was not delivered at the same time. He was "certain" that plaintiff did not have an incompetent cervix because "[a]s soon as the first baby delivered, all the contractions stopped on [their] own." He stated that there was at least an eight-hour gap between the first delivery and the surgery to close the cervix and that, if plaintiff was suffering from an incompetent cervix, then the second baby would have been delivered during that time.

Dr. Zarghami testified that plaintiff first told him about the accident early in the evening of October 1, 2000 while he was reviewing her medical history with her. He acknowledged, however, that his medical records did not mention that plaintiff had informed him of the accident. Counsel then challenged the doctor on his conclusion that plaintiff had suffered a direct trauma to her abdomen during the accident. The following exchange took place:

Q. Do you know if Mrs. Creanga suffered a direct trauma to her abdomen?

A. She had a car accident.

Q. But what do you base—

A. And then within two days after the car accident she went into labor.

Q. But do you have any information that she suffered a direct trauma to her abdomen during that car accident?

A. What information do you need?

Q. Did she tell you that?

A. No. Actually, when I was trying to figure out why she went [in]to premature labor, went to her history, she said by the way I did have [an] accident, because I did ask her did you have any trauma or anything to your belly. She said I was rear-ended by a car two days ago but I'm not sure that that's related to this. I said well it's concomitant and it should be related because I have no reason for you to go into premature labor.

\* \* \* \*

Q. If she had not had direct trauma to her abdomen, would your opinion still be the same?

A. Not necessarily.

Dr. Zarghami also stated that he did not know whether plaintiff was wearing a seat belt at the time of the accident.

Further testing his opinion, counsel asked Dr. Zarghami whether plaintiff's pregnancy had been high-risk. The doctor admitted that a twin pregnancy is high-risk but said that plaintiff's family history and her prior abortions did not add to the risk. The fact that plaintiff was carrying twins, "at this stage of the game," also was not a factor in causing the premature labor. Additionally, the doctor stated that if plaintiff was injured during her abortions, such an injury could have had an effect on the pregnancy, but she would not have had contractions.

Prior to trial, defendants filed a motion for summary judgment seeking to dismiss plaintiff's claim for the loss of the fetus. The trial court denied defendants' summary judgment motion, and defendants then filed a motion *in limine* to preclude Dr. Zarghami's testimony on the basis that it was a "net opinion." The trial court granted that motion, dismissed plaintiff's complaint, and denied reconsideration of the dismissal. The Appellate Division affirmed both the preclusion of the expert's opinion and the dismissal of the complaint, reasoning that "Dr. Zarghami's opinion was not based on the facts in the case, but was a net opinion, based solely on his subjective belief." We granted certification. 183 *N.J.* 213, 871 *A.*2d 91 (2005).

## II.

To prove a claim of negligence, a plaintiff must show that the defendant's actions were the proximate cause of his or her injury. *Reynolds v. Gonzalez,* 172 *N.J.* 266, 282–83, 798 *A.*2d 67 (2002). Expert medical testimony often is used to demonstrate a causal link between the defendant's allegedly negligent conduct and the plaintiff's injury. *See generally Gardner v. Pawliw,* 150 *N.J.* 359, 696 *A.*2d 599 (1997); *Vitrano v. Schiffman,* 305 *N.J.Super.* 572, 702 *A.*2d 1347 (App.Div.1997). New Jersey Rule of Evidence 702, which governs the admission of expert testimony, states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an

expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

[*N.J.R.E.* 702.]

This Court has recognized that *N.J.R.E.* 702

imposes three basic requirements: "(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony."

[*Kemp ex rel. Wright v. State*, 174 *N.J.* 412, 424, 809 *A.*2d 77 (2002) (quoting *Landrigan v. Celotex Corp.*, 127 *N.J.* 404, 413, 605 *A.*2d 1079 (1992)).]

The only element of *Rule* 702 disputed in this appeal is whether Dr. Zarghami's expert testimony is sufficiently reliable. As the Court has stated, "in order to meet that requirement the proponent of the expert testimony [is] required to demonstrate that the expert's opinion or theory [is] generally accepted within the scientific community." *Ibid.* To determine sufficient reliability in this matter we must consider whether differential diagnosis is admissible as a general matter, and, specifically, whether Dr. Zarghami's differential diagnosis is admissible. If so, we then must consider whether the courts below erred when they precluded Dr. Zarghami's opinion as a net opinion.

A.

As used in the medical community, a differential diagnosis is a medical construct for determining "which one of two or more diseases or conditions a patient is suffering from, by systematically comparing and contrasting their symptoms." *Dorland's Illustrated Medical Dictionary* 377 (23d ed.1957) [hereinafter *Dorland's* ]; *see also Ruggiero v. Warner–Lambert Co.*, 424 *F.*3d 249, 254 (2d Cir.2005) ("A differential diagnosis is 'a patient-specific process of elimination that medical practitioners use to identify the 'most likely' cause of a set of signs and symptoms from a list of possible causes.' ") (citations omitted). Courts that have considered differential diagnosis testimony have "come to use the term in ways that differ slightly from its dictionary definition." *Clausen v. M/V New Carissa*, 339 *F.*3d 1049, 1057 n. 4 (9th Cir.2003).

"Whereas most physicians use the term to describe the process of determining which of several *diseases* is causing a patient's *symptoms,* courts have used the term in a more general sense to describe the process by which *causes* of the patient's *condition* are identified." *Ibid.* (citations omitted).

▮▮▮ The first step in properly conducting a differential diagnosis is for the expert to "rule[ ] in" all plausible causes for the patient's condition by compiling "a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration." *Id.* at 1057. At this stage, the issue "is which of the competing causes are *generally* capable of causing the patient's symptoms or mortality." *Id.* at 1057–58. A differential diagnosis that "rules in a potential cause that is not so capable" or fails to consider a plausible hypothesis that would explain the condition has not been properly conducted. *Id.* at 1058 (emphasis omitted). "Including even rare entities in the list 'ensures that such disorders are not overlooked.' " *Ibid.* (quoting Jerome P. Kassirer & Richard I. Kopelman, *Learning Clinical Reasoning* 112 (1991)).

▮▮▮ Second, after the expert "rules in" plausible causes, the expert then must rule out those causes that did not produce the patient's condition by engaging "in a process of elimination, eliminating hypotheses on the basis of a continuing examination of the evidence so as to reach a conclusion as to the most likely cause of the findings in that particular case." *Ibid.* An expert "need not conduct every possible test to rule out all possible causes of a patient's [injury], 'so long as he or she employed sufficient diagnostic techniques to have good grounds for his or her conclusion.' " *Heller v. Shaw Indus., Inc.,* 167 *F.*3d 146, 156 (3d Cir.1999) (quoting *In re Paoli R.R. Yard PCB Litig.,* 35 *F.*3d 717, 761 (3d Cir.1994), *cert. denied,* 513 *U.S.* 1190, 115 *S.Ct.* 1253, 131 *L.Ed.*2d 134 (1995)).

Differential diagnosis testimony has been permitted in New Jersey on the causation issue in toxic tort cases. *See Lapka v. Porter Hayden Co.,* 162 *N.J.* 545, 557, 745 *A.*2d 525 (2000);

*Rubanick v. Witco Chem. Corp.*, 125 *N.J.* 421, 450–51, 593 *A.*2d 733 (1991). Those cases that have permitted such testimony do not suggest that its use is limited to only toxic torts and we see no basis for such a limitation. *See generally Lapka, supra,* 162 *N.J.* 545, 745 *A.*2d 525; *Rubanick, supra,* 125 *N.J.* 421, 593 *A.*2d 733. Indeed, at the federal level, the use of differential diagnosis has been broadly accepted. The United States Court of Appeals for the Third Circuit has recognized that "differential diagnosis generally is a technique that has widespread acceptance in the medical community." *Paoli, supra,* 35 *F.*3d at 758; *see also Westberry v. Gislaved Gummi AB,* 178 *F.*3d 257, 262 (4th Cir. 1999) (stating that differential diagnosis "has widespread acceptance in the medical community, has been subject to peer review, and does not frequently lead to incorrect results") (citation omitted); *Heller, supra,* 167 *F.*3d at 154–55 (noting that "differential diagnosis consists of a testable hypothesis, has been peer reviewed, contains standards for controlling its operation, is generally accepted, and is used outside of the judicial context") (internal quotation marks omitted). Several state courts also have accepted differential diagnosis as a reliable form of expert testimony. *See, e.g., Carlson v. Okerstrom,* 267 *Neb.* 397, 675 *N.W.*2d 89, 105–07 (2004) (finding reliable differential diagnosis testimony admissible); *Easum v. Miller,* 92 *P.*3d 794, 804 (Wyo.2004) (holding doctor's differential diagnosis testimony admissible).

Accordingly, because of the widespread acceptance of differential diagnosis in the medical community, the recognition of the technique in state and federal courts, and its compatibility with our rules of evidence and prior case law, we conclude that a trial court may admit an expert's differential diagnosis into evidence. However, "that does not mean that simply by uttering the phrase 'differential diagnosis,' an expert can make his or her opinion admissible." *Carlson, supra,* 675 *N.W.*2d at 105. To be admitted, the expert witness must demonstrate what he or she did and that the proper diagnostic procedures were followed when performing the diagnosis. *See Clausen, supra,* 339 *F.*3d at 1057

(stating that "federal courts, generally speaking, have recognized that a *properly conducted* differential diagnosis is admissible") (emphasis added). A court is "justified in excluding evidence if an expert 'utterly fails … to offer an explanation for why the proffered alternative cause' was ruled out." *Id.* at 1058 (quoting *Cooper v. Smith & Nephew, Inc.*, 259 *F.*3d 194, 202 (4th Cir.2001)). In rejecting the alternative hypotheses, the expert must use "scientific methods and procedures" and justify an elimination on more than "subjective beliefs or unsupported speculation." *Claar v. Burlington N. R.R. Co.*, 29 *F.*3d 499, 502 (9th Cir.1994). Further, "conclusions based on discredited or improperly performed diagnostic tools are suspect." *Carlson, supra,* 675 *N.W.*2d at 106.

### B.

Applying the above standards to this appeal, we conclude that the trial court should have admitted Dr. Zarghami's testimony as a properly conducted differential diagnosis. Dr. Zarghami's testimony constituted a differential diagnosis within the definition of that term because he gave an opinion on the cause of plaintiff's injury after ruling out other possible causes. *See Dorlan's, supra,* at 377 (defining differential diagnosis).

Dr. Zarghami also followed the two-step process for properly conducting a differential diagnosis. As noted, Dr. Zarghami first was required to consider all plausible causes for plaintiff's condition. Based on his testimony, the following explanations were considered for the premature labor: plaintiff had an incompetent cervix, evidenced by the fact that her mother had an incompetent cervix as well as eleven miscarriages; plaintiff's three prior abortions led to complications with her current pregnancy; the risk of carrying twins, including the higher frequency of premature births in twins; preeclampsia; high blood pressure; any infective cause that could have induced premature labor; and the automobile accident. Because it appears that Dr. Zarghami considered a

broad range of possible causes for the miscarriage, we find that he properly conducted the first part of the differential diagnosis.

Dr. Zarghami then was required to rule out those causes that did not produce plaintiff's condition by engaging in a continuing examination of the facts surrounding her premature labor. In reaching his conclusion, he ruled out the possibility of an incompetent cervix because plaintiff would not have had contractions if she was suffering from that ailment. Additionally, plaintiff's mother's medical history was not viewed by Dr. Zarghami as determinative because plaintiff had had a normal pregnancy with her first child. He also explained that plaintiff's three prior abortions were not a factor in the premature delivery because, if plaintiff's cervix had been scarred during those abortions, she would not have had contractions during the premature delivery. Although the doctor admitted that there is a higher frequency of premature birth in twins, he testified that, at that point in plaintiff's pregnancy, the fact that she was carrying twins was not a factor in causing the premature labor. Further, Dr. Zarghami did not find evidence of preeclampsia, high blood pressure, or any infective cause that could have induced premature labor.

Although Dr. Zarghami's testimony undoubtedly was influenced by the temporal connection between the accident and the miscarriage, the consideration of temporality is proper in this matter. As stated in *Carlson, supra,* 675 *N.W.*2d at 106, "[w]hen a patient develops symptoms after encountering an agent which is known to be capable of causing those symptoms" a court is more likely to admit the testimony. Here, we note that trauma is known to be capable of causing premature labor. *See Pan–American Cas. Co. v. Reed,* 240 *F.*2d 336, 339 (5th Cir.1957) (stating that "there is evidence that trauma frequently induces premature labor"). Thus, as recognized in *Carlson, supra,* 675 *N.W.*2d at 107, Dr. Zarghami's "reliance upon the temporal factor is entitled to greater weight." Because of Dr. Zarghami's background in treating plaintiff, as well as his reasoned analysis eliminating other expla-

nations for the premature delivery, we conclude that his testimony was admissible as properly conducted differential diagnosis.

### III.

Our holding concerning the permissibility of differential diagnosis does not conclude the matter. We also must determine whether Dr. Zarghami's opinion was, as the trial court and Appellate Division found, a net opinion and, thus, inadmissible.

### A.

As stated in *N.J.R.E.* 703, an expert's opinion must be based upon "facts or data ... perceived by or made known to the expert at or before the hearing." An expert's conclusion is considered to be a "net opinion," and thereby inadmissible, when it is a bare conclusion unsupported by factual evidence. *Buckelew v. Grossbard*, 87 *N.J.* 512, 524, 435 *A.*2d 1150 (1981); *see also Johnson v. Salem Corp.*, 97 *N.J.* 78, 91, 477 *A.*2d 1246 (1984) (noting that " '[t]he weight to which an expert opinion is entitled can rise no higher than the facts and reasoning upon which that opinion is predicated' ") (citation omitted). In other words, an expert must " 'give the why and wherefore' of his or her opinion, rather than a mere conclusion." *Rosenberg v. Tavorath*, 352 *N.J.Super.* 385, 401, 800 *A.*2d 216 (App.Div.2002) (citation omitted). Medical-opinion testimony concerning the cause of an injury " 'must be couched in terms of reasonable medical certainty or probability; opinions as to possibility are inadmissible.' " *State v. Freeman*, 223 *N.J.Super.* 92, 116, 538 *A.*2d 371 (App.Div.1988), *certif. denied*, 114 *N.J.* 525, 555 *A.*2d 637 (1989) (citation omitted). However, such testimony is not inadmissible simply "because it fails to account for some particular condition or fact which the adversary considers relevant." *Ibid.*

Applying those principles, the Appellate Division in *Vitrano, supra*, 305 *N.J.Super.* at 577, 702 *A.*2d 1347, held that an expert's opinion was "not a net opinion because it [was] based upon the facts contained in the surgical report" prepared by another physi-

cian who diagnosed the condition and performed the surgery. Additionally, in *Nguyen v. Tama,* 298 *N.J.Super.* 41, 49, 688 *A.*2d 1103 (App.Div.1997), the court admitted an expert's testimony because the "opinion was supported by . . . references to defendant's office records, the hospital records and [the expert's] own experience" and, therefore, was not a net opinion. So too, in *Costantino v. Ventriglia,* 324 *N.J.Super.* 437, 451, 735 *A.*2d 1180 (App.Div.1999), the panel found that an expert's opinion was not a net opinion when the expert testified based on, among other things, an interview with the plaintiff and a review of his medical records.

### B.

The Appellate Division held that Dr. Zarghami's testimony is a net opinion because it found that his opinion was "based solely on his subjective belief," not on facts in the case. Although plaintiff testified at her deposition that she was wearing a seatbelt at the time of the accident, the panel noted that she did not state that she suffered trauma to her abdomen or that her abdomen was struck during the accident. The panel also noted that Dr. Zarghami testified that he did not know whether plaintiff had suffered trauma to her abdomen during the accident.

We share the Appellate Division's concern that Dr. Zarghami made his diagnosis without knowing whether any specific trauma occurred to plaintiff's abdomen during the accident. We note, however, that the purpose of differential diagnosis is that it allows experts to make conclusions on medical causation in circumstances where they do not have all the necessary facts to prove a single hypothesis. A differential diagnosis does not prove one hypothesis, but rather, it allows the expert to use the facts at hand to disprove all other hypotheses. Had Dr. Zarghami specifically known that plaintiff suffered direct trauma to her abdomen, that knowledge probably would have reinforced his conclusion. But that fact simply would have supplemented the doctor's conclusion;

its absence does not denote that his opinion was "based solely on his subjective belief" as was found by the Appellate Division.

Here, the doctor not only stated his conclusion but also set forth, with specificity, the reasons for coming to that conclusion. In his original written report, Dr. Zarghami noted:

> It is my opinion, within a reasonable degree of medical certainty that Ms. Creanga probably suffered a direct trauma to her abdomen on September 29, 2000 from the car accident that she was involved in. As a further result of this trauma, I believe her labor was initiated leading to the delivery of her first baby. At this point, there was no medical reason to suspect that labor would have been initiated at this stage of her pregnancy—no other causes to initiate pregnancy were present.

Also, as discussed earlier, Dr. Zarghami explained in his *de bene esse* deposition that he considered numerous alternatives in reaching his determination. *See supra* pp. 351–54, 358–60, 886 *A.*2d at 636–38, 640–41. He also testified that trauma is a known cause of premature labor and noted that the accident was only a couple of days prior to the labor. *See Carlson, supra,* 675 *N.W.*2d at 106–07 (finding testimony relying on temporal proximity of accident and plaintiff's condition admissible because trauma was known cause of plaintiff's injury). Additionally, as in *Nguyen, supra, Vitrano, supra,* and *Costantino, supra,* Dr. Zarghami's conclusion was supported by reference to both his records and hospital records prepared by other doctors who had examined plaintiff, as well as his own medical experience, his past history of treating plaintiff, and his interview with plaintiff the day after the miscarriage. He also stated that he reached his conclusion with a reasonable degree of medical certainty as required by *Freeman, supra,* 223 *N.J.Super.* at 116, 538 *A.*2d 371. Accordingly, Dr. Zarghami not only provided his conclusion that plaintiff's premature labor was caused by the automobile accident, but also gave the "why and wherefore" for that conclusion. *Rosenberg, supra,* 352 *N.J.Super.* at 401, 800 *A.*2d 216.

To be sure, there may be inconsistencies in Dr. Zarghami's testimony, but those inconsistencies go to the weight to be given by the fact-finder to Dr. Zarghami's testimony, and not to its admissibility. In this context, it is the role of the jury—and not of the court on summary judgment—to consider any inconsistencies

when it decides how much weight to assign to his testimony. In this appeal, the alleged inconsistencies do not render Dr. Zarghami's opinion inadmissible. His testimony, therefore, was improperly excluded.

## IV.

For the reasons stated, we reverse the judgments of the trial court and the Appellate Division and remand to the trial court for reinstatement of the complaint.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.