**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1884-24

JANE JLW ROE,

      Plaintiff-Appellant/
      Cross-Respondent,

v.

JERSEY CITY PUBLIC SCHOOLS,
and ACADEMY OF THE ARTS AT
HENRY SNYDER HIGH SCHOOL,

      Defendants,

and

THE JERSEY CITY BOARD OF
EDUCATION,

      Defendant-Respondent/
      Cross-Appellant.

_____

Submitted March 10, 2026 – Decided April 8, 2026

Before Judges Gilson, Firko, and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-4556-21.

Motley Rice New Jersey, LLC, attorneys for appellant/cross-respondent (Daniel R. Lapinski, on the briefs).

Shah Law Group, attorneys for respondent/cross-appellant (Roshan D. Shah, of counsel and on the briefs; Dennis C. Schmieder and Jamayrah E. Moore, on the briefs).

PER CURIAM

Plaintiff Jane JLW Roe appeals from the January 17, 2025 trial court order granting defendant the Jersey City Board of Education (Board)[1] summary judgment and dismissing her complaint under the Tort Claims Act, N.J.S.A. 59:1-1 to 12-3 (TCA), after finding her medical expert's opinion was an inadmissible net opinion. The Board cross-appeals from the court's order denying its application to bar plaintiff's liability expert's opinion as an inadmissible net opinion. After reviewing the record, parties' arguments, and applicable law, we reverse the court's order barring Roe's medical expert's opinion as a net opinion and vacate the dismissal of her complaint. We direct the court on remand to conduct an N.J.R.E. 104 hearing to address the medical

---

[1] We note that the trial court entered a January 30, 2025 order amending the January 17 order and dismissing the complaint "with prejudice as to . . . [d]efendants . . . Jersey City Public Schools[ and the] Academy of the Arts at Henry Snyder High School." Plaintiff does not challenge the dismissal of the co-defendants. Accordingly, we refer to only the Board throughout the opinion.

expert's opinion regarding the permanency of Roe's alleged psychiatric injuries. Further, we affirm the court's order denying the Board's motion to bar plaintiff's liability expert.

I.

In 1989, Roe attended Henry Snyder High School (HSHS) as a freshman. The Board oversees and operates HSHS, which is part of the Jersey City Public School District. Roe joined HSHS's girls' track team during her freshman year. P.E.[2] was the girls' track coach during Roe's freshman year. Because HSHS did not have an outside running track for practice, the students ran after school primarily "in the halls." Most school days, the girls practiced in HSHS's "third floor" hallways. Roe asserted P.E. allowed the students to practice alone and was not "always present." She further alleged P.E. sometimes left before the team finished practicing, and there were no assistant coaches.

Roe alleged during practices at HSHS, she was "raped" by "a white janitor" multiple times. She was about "fourteen[ or] fifteen" years old at the time. She asserted that "[o]ne of [her] many rapes" was in a dark HSHS "stairwell" against "a metal fence." Roe maintained the janitor "wore tan boots,

---

[2] We use initials and pseudonyms to protect the privacy of the victim. See R. 1:38-3(a).

stone-washed jeans, [a] white T-shirt," and he had a "very neat ponytail." She recalled the janitor "always had keys dangling from his jeans." She remembered the janitor "ran his hand down her neck" and "pa[id] particular attention to [her] hair" during an assault. Roe could not identify the janitor by name and he, therefore, could not be joined as a defendant.

Roe described an instance in which the janitor approached her carrying her "belongings and directed [her] to the stairwell." The janitor blocked her path, refused to let her move, and "[led her] where he wanted." She felt physically intimidated by him. She maintained the janitor "vaginal[ly] rape[d]" her from behind and stated, "You can[no]t tell anyone. I will get in trouble." Roe recalled he suggested "no one would believe" her if she reported it. Roe represented she stayed on the track team because she would have had to explain quitting the sport she loved.

Roe asserted the janitor also "raped [her] in the [men's] bathroom on the third floor" of HSHS. Each time she was sexually assaulted during her freshman year, Roe alleged the janitor pulled her pants down and vaginally penetrated her from behind.

During an HSHS "sanctioned" summer camp "trip," after her freshman year, Roe revealed at a campfire discussion attended by students, a female HSHS

4

A-1884-24

teacher, and a male "camp counselor" that she was "raped a lot of times" by "a janitor." The male counselor told her that she would "be all right" and "[i]t [wa]s good to get it out." After the disclosure, Roe believed the female teacher "informed [HSHS] of the abuse" because L.O. became the new track team coach her sophomore year and instituted "a buddy system," along with other changes. Roe recalled L.O. would drive her "home if [she] was by [her]self" and always "knew . . . when [they] all left." Plaintiff stated L.O. was "present" and "attentive" during practices, and had assistant coaches monitor the practices. Plaintiff maintained the janitor committed no sexual assaults during her sophomore year. After her sophomore year, Roe moved to Pennsylvania where she finished high school.

On November 22, 2021, plaintiff filed a five-count complaint alleging claims of: negligence, negligent training and supervision, negligent hiring and retention, gross negligence, and negligent infliction of emotional distress. The Board filed an answer and discovery ensued.

During her deposition, Roe revealed that sometime after the janitor sexually assaulted her, two male strangers pulled her into a van and "vaginally rape[d]" her. That assault did not occur at the school, rather it happened after

Roe was abducted from a city street. She did not report the sexual assault to anyone.

Roe claimed the sexual assaults at HSHS caused her "shock, emotional distress, disgrace, humiliation, embarrassment, loss of self-esteem, . . . physical injuries, including physical manifestations of emotional distress, panic attacks[,] and the loss of enjoyment of life." She did not seek physical or mental health treatment after the sexual assaults. Regarding how the sexual assaults changed her, Roe maintained she has "triggers" when in bathrooms, when someone approaches her from behind, and when thinking about her daughter's safety. Roe obtained an associate's degree "in psychology." After she filed suit, she began treatment with a therapist in 2023, incurring an "estimated treatment cost of at least $3,120" from attending sessions "two times per month at a cost of $130 per session."

At L.O.'s deposition in 2023, he testified that he started working for HSHS in 1976. He acknowledged coaching the boys' and girls' track team "on and off . . . for about [thirty] years." In 1989, he became HSHS's vice principal. He confirmed P.E. was the HSHS track coach in 1989. L.O. had "knowledge of the policy and procedures that were in place at" HSHS "related to administrative functions." He explained teachers are responsible for students "from the time

6

that students [arrive] in a classroom," but he did not have "a distinct memory . . . of any written policy that was in place at that particular point in time." During the years 1976 to 1984, he coached the track teams most years and had assistant coaches. He relayed the coaches "took responsibility for the young ladies that were on the team." He held practices each day after school, from approximately 3:15 p.m. to 6:15 p.m., with most sessions taking place in the school building. He confirmed that during practice he "paired up" the similarly skilled track athletes.

L.O. specifically recalled coaching Roe during her sophomore year and remembered she was a "tremendous" and "[o]utstanding athlete." He got to know her over the two years she was at HSHS. L.O. did not consider P.E. "to be a proficient and skilled track coach," which resulted in L.O. expressing these concerns at the time to "the then athletic director supervisor." Specifically, L.O. observed "red flags that indicated that [P.E.] did not know what he was doing."

During discovery, plaintiff served the medical expert report of Howard L. Forman, M.D., a board-certified psychiatrist. Dr. Forman had evaluated and treated "over 2,500 victims of childhood sexual abuse during [his] career."

Dr. Forman conducted a forensic psychiatric examination of Roe on September 6 and September 26, 2023. He considered Roe's and L.O.'s

depositions, as well as other documents produced in discovery. In his report, Dr. Forman recognized "it is important to not only absorb the information the evaluee is sharing but then to ask, does this make sense both rationally and according to the scientific literature?" Dr. Forman determined Roe "suffered from generalized anxiety disorder (GAD) and post[-]traumatic stress disorder (PTSD) based on the most widely used diagnostic criteria." He determined that Roe's GAD and PTSD were caused from being "serial[ly] rape[d] by a single male perpetrator working as a janitor at her school" and that "[t]he sexual assaults occurred in school bathrooms and stairwells during after-school track practice." His opinions were offered to "a reasonable degree of medical certainty."

In the evaluation process, Dr. Forman assessed Roe using the "M.I.N.I. International Neuropsychiatric Interview," which he asserted "is the most widely used psychiatric structured diagnostic interview instrument in the world." The screening tests found Roe was positive for GAD and PTSD. Further, in reaching Roe's psychiatric diagnoses, Dr. Forman used the well-recognized criteria in the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders' (DSM-5).

A-1884-24

Dr. Forman relayed that Roe emotionally conveyed that "Jersey City did [not] protect little black girls" and she "had no reason to believe confiding in other adults would help make her world more just" because the teacher she disclosed the assaults to did not act on her behalf. In addressing causation, Dr. Forman opined "Roe developed PTSD related to the serial rapes she experienced at [HSHS]" and her "treatment of PTSD . . . is complex and requires expert clinicians in at least two domains, psychopharmacology and psychotherapy."

During his deposition, Dr. Forman acknowledged Roe did not disclose to him that after the janitor began sexually assaulting her at HSHS, she was "raped by two people and then dumped out of the van." However, Dr. Forman explained he considered the later sexual assault by two men because she revealed the incident in her deposition. After considering the sexual assaults, Dr. Forman was "confident that" the "PTSD diagnosis . . . [was] related to [Roe's] events at the school with the janitor." He reasoned that "in terms of timing, [Roe] indicated to [him] that [the first sexual assault at HSHS] was how she lost her virginity." Dr. Forman expressed that the loss of "[Roe's] virginity" "was her sentinel sexual event." Further, Dr. Forman relied on the external reminders that Roe experienced related to the sexual assaults at HSHS, including her fear about "the last stall of a public bathroom," her need to "participate in things like school

9

drop-offs and school pickups" for her daughter, and her inability "to connect with people."

Dr. Forman specifically explained differentiating between the school incidents and the van incident based on "the content of the PTSD findings." He described, in differentiating the van assault, that he considered Roe had "spent a significant amount of her adult life" working in the auto industry without "an avoidance." Conversely, he also considered her resulting "triggers . . . related to . . . avoidance, hyperarousal, [and] intrusive memories of what went on in the school." Regarding the diagnoses, he qualified that Roe's "GAD was really submerged or super[s]eded by the PTSD diagnosis." Dr. Forman cited six resources that he relied on regarding childhood sexual abuse. He acknowledged Roe could undergo treatment to reduce her PTSD symptoms.

Roe also produced a liability expert report from Joseph Steven Schwartzberg, Ed.D. Dr. Schwartzberg has a "Bachelor of Science in Education," a master's degree "in Special Education," a doctorate "in Education at Columbia University," multiple education related certifications, and professional education experience. Dr. Schwartzberg relayed he is "an education expert with particular expertise in areas of school administration under circumstances similar to those present in this case, including school

safety, staff supervision and safety, and the development of appropriate policies, procedures, and programs to protect the health, safety, and welfare of students."

Dr. Schwartzberg "opine[d] on the issues related to the extent to which . . . [the Board] . . . acted or failed to act in accordance with the standards of care in place at the time of the alleged incident." In addressing the applicable standards of care to this case, Dr. Schwartzberg opined that New Jersey requires "[t]eachers and school administrators . . . to supervise children in their facilities" and applies "the 'in loco parentis standard.'" He also cited to "the Child Abuse Prevention and Treatment Act (CAPTA)[, 42 U.S.C. §§ 5101 to 5116]." Dr. Schwartzberg reviewed the facts alleged in Roe's and L.O.'s depositions, as well as the Board's answers to interrogatories and notice to produce. He concluded there was "no evidence in the record that [the Board] had any policies or procedures in place to ensure the health, welfare, and safety of students during after[-]school activities," and the HSHS "sponsored activity was effectively unsupervised."

Dr. Schwartzberg opined the following three breaches of the standard of care were committed: a failure "to enact policies and procedures relative to the health, welfare, and safety of its students for the relevant time frame," the failure "to enforce basic policies and procedures related to the supervision and

11

protection of students and, as a result, the risk of serious harm to students was foreseeable and could have been easily corrected," and "a failure to properly supervise and protect . . . Roe."

Months after Dr. Schwartzberg and Dr. Forman offered their reports, the Board's corporate designee, E.R., was deposed. E.R. asserted he communicated with previous administrative staff and reviewed documents in preparation for his deposition. E.R. explained he began his employment with the Board in 2020 but had "worked for Jersey City since" 1995. E.R. confirmed he could not find any policies and procedures from 1989 or 1990, and the Board had a general policy of removing documents that were more than ten years old.

On November 22, 2024, the Board moved for summary judgment, which Roe opposed. The Board argued Dr. Forman failed to specifically opine Roe's psychological injuries were permanent and he rendered a net opinion. Further, the Board argued Roe failed to demonstrate, under the TCA, that the "out of pocket cost threshold" was met.[3] Regarding Dr. Schwartzberg's opinion, the Board argued that because he failed to state an "objective standard of care" for the relevant period of time, he also rendered a net opinion. The Board asserted

---

[3] On appeal, the parties have stipulated that the applicable TCA threshold Roe had to establish was $1,000 in medical expenses.

that "CAPTA has nothing to do with the issues in this case" and cannot be used as a standard. Finally, the Board argued Roe's claims for negligent training and supervision, negligent hiring and retention, and negligent infliction of emotional distress should be dismissed because she could not identify the janitor.[4]

After argument, the court granted the Board's motion, finding Dr. Forman rendered a net opinion and plaintiff failed to demonstrate sufficient medical expenses to vault the TCA threshold. The court determined Dr. Forman's opinion did not "demonstrate how [p]laintiff's GAD and PTSD were caused solely by the sexual assaults she endured at [HSHS]." The court cited our holding in J.H. v. Mercer County Youth Detention Center, where we affirmed summary judgment based on the expert's failure to "differentiate" between a plaintiff's "emotional distress caused by the [sexual assault] events at the detention center [and] plaintiff's preexisting personality disorder." 396 N.J. Super. 1, 21 (App. Div. 2007). The court reasoned that Dr. Forman did not differentiate Roe's "emotional distress caused by the subject events from any emotional distress that transpired as a result of the other sexual assaults that [she] had endured." The court also determined Dr. Forman's opinion and Roe's future treatment costs were "speculative."

---

[4] Roe does not appeal the dismissal of these three claims.

Regarding whether Dr. Schwartzberg's opinion was a net opinion, the court found he "adequately set[] forth the 'why and wherefore' that support[ed] his opinion." The court reasoned that Dr. Schwartzberg's opinions were based on the record and recognized a "level of oversight and protection." It highlighted Dr. Schwartzberg's reliance on L.O.'s deposition testimony that he was "[un]aware of any written school policies or procedures in the 1989-1990 timeframe."

On appeal, plaintiff contends: the court abused its discretion in characterizing Dr. Forman's expert opinion as an impermissible "net opinion"; Dr. Forman is qualified to render an expert opinion concerning Roe's sexual assault and psychological response to same; the court erroneously disregarded the weight of the evidence demonstrating the reliability of Dr. Forman's opinion that Roe's serial sexual assaults at HSHS were more traumatizing to her psychological state than the later unrelated assault; the court also erred in excluding evidence of Roe's psychiatric injuries and projected costs of her future psychological treatment; Roe's out-of-pocket medical expenses resulting from the sexual abuse satisfy the monetary threshold of N.J.S.A. 59:9-2; and Roe has demonstrated permanent and substantial injuries that satisfy N.J.S.A. 59:9-2. In

its cross-appeal, the Board argues the court erred in failing to exclude Dr. Schwartzberg's opinion as a net opinion.

II.

We review a trial court's summary judgment decision de novo, "applying the same standard used by the trial court" under Rule 4:46-2(c). Samolyk v. Berthe, 251 N.J. 73, 78 (2022). "The court's function is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)). To rule on summary judgment, courts must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46 (2007)); see also Rozenblit v. Lyles, 245 N.J. 105, 121 (2021) (applying same standard for cross-motions for summary judgment).

The TCA seeks to accomplish "the public policy of this State that public entities shall only be liable for their negligence within the limitations of this act and in accordance with the fair and uniform principles established herein."

N.J.S.A. 59:1-2.  Under the TCA, the Legislature established that "[g]enerally, immunity for public entities is the rule and liability is the exception."  Nieves v. Adolf, 241 N.J. 567, 575 (2020) (quoting Fleuhr v. City of Cape May, 159 N.J. 532, 539 (1999)).  The TCA "delineates both procedural and substantive requirements for bringing a tort claim against the State, public entities, and public employees."  Ibid.  The TCA "preclud[es] damages for pain and suffering [against a public entity] unless certain circumstances are met."  C.W. v. Roselle Bd. of Educ., 474 N.J. Super. 644, 650 (App. Div. 2023) (quoting E.C. by D.C. v. Inglima-Donaldson, 470 N.J. Super. 41, 55 (App. Div. 2021)).

N.J.S.A. 59:9-2(d) addresses the threshold a plaintiff must establish for an award for pain and suffering under the TCA.  At the time of plaintiff's alleged assault, subsection (d) provided the following:

> No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $1,000.00.[5]

[5] The limit was increased to $3,600 from $1,000 effective September 21, 2000. L. 2000, c. 126, § 32.  Here, the parties had argued below that the $3,600 threshold applied but have now stipulated on appeal that plaintiff must only demonstrate medical treatment expenses of $1,000.  See Knowles v. Mantua Twp. Soccer Ass'n, 176 N.J. 324, 329 (2003) (applying the TCA threshold applicable at the time of the underlying cause of action).

For purposes of this section[,] medical treatment expenses are defined as the reasonable value of services rendered for necessary surgical, medical[,] and dental treatment of the claimant for such injury, sickness[,] or disease, including prosthetic devices and ambulance, hospital[,] or professional nursing service.

[N.J.S.A. 59:9-2(d).]

In 2019, the Legislature enacted the Child Victims Act (CVA), L. 2019, c. 120, which expanded the rights of sexual assault victims. The CVA includes N.J.S.A. 59:2-1.3, which establishes that "immunity from civil liability granted by [the TCA] to a public entity or public employee shall not apply to an action at law for damages as a result of a sexual assault . . . , which was caused by a willful, wanton[,] or grossly negligent act." In "disabling . . . [TCA] immunities in sexual misconduct cases, the Legislature undoubtedly intended to make the plaintiff's pursuit of a remedy realistic rather than illusory." E.C. by D.C., 470 N.J. Super. at 51.

The Legislature has clearly "stated [a] desire to expand the rights of victims of sexual assaults and other sexual misconduct." Id. at 47. In furtherance of expanding sexual assault victims claims, the Legislature, "[i]n addressing the fact that victims might also encounter sexual misconduct involving public entities and public employees, . . . disabled [TCA] immunities in circumstances defined by N.J.S.A. 59:2-1.3(a) and eliminated the procedural

17

notice-of-claim requirements" under N.J.S.A. 59:8-3(b).  Id. at 46-47.  We have held N.J.S.A. 59:2-1.3(a)(1)'s "plain language expresses that the public entity's immunities will be disabled when the sexual offense was caused by the willful, wanton[,] or grossly negligent conduct of the public entity 'or' public employee." Id. at 48 (quoting N.J.S.A. 59:2-1.3(a)(1)).  In E.C. by D.C., we explained:

> It may be true the phrase 'willful, wanton or grossly negligent' becomes unnecessary when a public employee is the sex offender, but [N.J.S.A. 59:2-1.3(a)(1)] encompasses much more than that particular instance.  For example, subsection (1) would apply when a public entity is an occupier of real property – like a school – and provides woefully inadequate security, thereby allowing a predator to enter the school and commit a sexual crime against a student.  In that circumstance, the acts or omissions of the public entity would have to be assessed through application of the willful, wanton[,] or grossly negligent standard.
>
> [Id. at 49-50.]

In interpreting N.J.S.A. 59:2-1(a)(1), we determined that "when the wrongful state of mind is provided by the public employee's sexual offense, there is no need for a plaintiff to establish that the public entity also engaged in willful, wanton[,] or grossly negligent conduct."  Id. at 52.

Our Supreme Court, in Hornor v. Upper Freehold Regional Board of Education, ___ N.J. ___ (March 11, 2026) (slip op. at 5), recently interpreted whether N.J.S.A. 59:2-1.3(a) "authorizes the imposition of vicarious liability on

18

a school district for a [school employee's] sexual abuse of a student outside the scope of [his or her] employment." The Court noted "N.J.S.A. 59:2-1.3(a)'s opening clause -- '[n]otwithstanding any provision of the [TCA] to the contrary' -- reflects that any TCA provision that confers immunity in other settings simply does not apply to sexual assault and sexual misconduct claims within the scope of that statute." Id. at ___ (slip op. at 37) (alterations in original); see also id. at ___ (slip op. at 38).

The Court went on to explain "since the [CVA]'s effective date, no TCA immunities protect public entities and public employees in . . . civil actions governed by N.J.S.A. 59:2-1.3(a)(1)." Id. at ___ (slip op. at 38). Further, the Court "tether[ed] vicarious liability to a determination [whether], under the totality of the circumstances, it reasonably appeared that the school employee's sexual abuse or other sexual misconduct involving the student was tacitly approved by the school." Id. at ___ (slip op. at 45). "That requirement focuses the inquiry on the knowledge and culpability of school officials and other school employees in a position to prevent or stop the abuse." Ibid.

The Court held that "in order to prevail on a vicarious liability claim . . . under N.J.S.A. 59:2-1.3(a)(1) against a public school arising from a school employee's sexual abuse or sexual misconduct against a student caused by a

19

willful, wanton, or grossly negligent act of the school employee," the plaintiff must show:

> (1) The school gave the employee who allegedly committed sexual abuse or other sexual misconduct described in N.J.S.A. 59:2-1.3(a)(1) the authority to control the student's educational environment;
>
> (2) the school employee's exercise of that authority resulted in the sexual abuse or sexual misconduct; and
>
> (3) it reasonably appeared that the school employee's sexual abuse of or sexual misconduct against the student was tacitly approved by the school.
>
> [Id. at ___ (slip op. at 46).]

The Court further explained "[r]elevant considerations may include (a) any policies, training, or other procedures implemented by the school to prevent or address the sexual abuse of students; (b) whether those policies . . . were enforced"; (c) the circumstances under which the abuse occurred and continued; "(d) whether the abuse took place on school property, at school-related events . . . , or in settings unconnected to the school; (e) whether the sexual abuse or sexual misconduct took place during school hours; and (f) whether" and how "the abuse was reported to school officials or other school employees, and . . . how and when those officials or employees responded to such a report." Id. at ___ (slip op. at 46-47). The Court offered an example, providing that

20

when the abusive "conduct occurred in the teacher's classroom over a period of days or weeks and school officials in the vicinity who reasonably should have been aware of the abuse did not intervene, a factfinder may reasonably find that the school tacitly approved the abuse." Id. at ___ (slip op. at 47-48).

### III.

We first address Roe's arguments that the court erred in barring Dr. Forman's psychiatric opinion because it constituted a net opinion. Roe contends the court's net opinion determination was erroneous because Dr. Forman's "written report and deposition testimony . . . articulated the facts, evidence, and data relied upon in forming his opinion and established the necessary 'why and wherefore' underlying his opinion." She argues the court improperly determined Dr. Forman "fail[ed] to differentiate" between Roe's sexual assaults in reaching his PTSD causation opinion because it is clear he considered her "deposition testimony" regarding the "sexual[] assault[] in a van" before writing his report. Roe further asserts Dr. Forman's opinion establishes a fact question regarding whether she sustained a permanent injury. After our review of Dr. Forman's report and deposition testimony, we conclude the court erred in excluding his opinion as a net opinion but remand for the court to hold an N.J.R.E. 104 hearing to address his conclusion on permanency.

21

Plaintiff bears the burden of proving her personal injury claims under the TCA. To meet that burden, it is well-recognized that "[e]xpert medical testimony . . . is used to demonstrate a causal link between the defendant's allegedly negligent conduct and the plaintiff's injury." Creanga v. Jardal, 185 N.J. 345, 354 (2005). Relevant here, our Supreme Court has concluded a medical expert's opinion that a plaintiff has suffered a "permanent psychological harm in the form of [PTSD] resulting from [a] rape . . . [may] constitute[] a 'permanent loss of a bodily function' within the meaning of N.J.S.A. 59:9-2(d)." Collins v. Union Cnty. Jail, 150 N.J. 407, 421 (1997).

"The admission or exclusion of expert testimony is committed to the sound discretion of the trial court." Townsend v. Pierre, 221 N.J. 36, 52 (2015). Our Supreme Court, in In re Accutane Litigation, "reaffirm[ed] that the abuse of discretion standard must be applied by an appellate court assessing whether a trial court has properly admitted or excluded expert scientific testimony in a civil case." 234 N.J. 340, 348 (2018). The admissibility of expert testimony is governed by N.J.R.E. 702. Generally, "(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be

sufficiently reliable; and (3) the witness must have sufficient expertise." Townsend, 221 N.J. at 53 (quoting Creanga, 185 N.J. at 355).

The Supreme Court has recognized that "[t]he net opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Id. at 53-54 (second alteration in original) (quoting Polzo v. County of Essex, 196 N.J. 569, 583 (2008)). "An expert is required to give the 'why and wherefore' of his or her opinion, not just a mere conclusion or speculation." Riley v. Keenan, 406 N.J. Super. 281, 295 (App. Div. 2009) (quoting Koruba v. Am. Honda Motor Co., 396 N.J. Super. 517, 525-26 (App. Div. 2007)). "To support a causal connection between the act complained of and the resulting injury or damage, experts must be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are scientifically reliable." Ibid. (quoting Koruba, 396 N.J. Super. at 526).

The Supreme Court explained in Creanga that an "expert witness must demonstrate what he or she did and that the proper diagnostic procedures were followed when performing the diagnosis." 185 N.J. at 357. It determined that a reliable "expert opinion derived from a differential diagnosis is admissible

under the New Jersey Rules of Evidence." Id. at 349. The Supreme Court considered that "courts" use the term "differential diagnosis" "in a more general sense to describe the process by which causes of the patient's condition are identified." Id. at 355-56 (quoting Clausen v. M/V New Carissa, 339 F.3d 1049, 1057 n.4 (9th Cir. 2003)). After an "expert 'rules in' plausible causes, the expert then must rule out those causes that did not produce the patient's condition by engaging 'in a process of elimination . . . so as to reach a conclusion as to the most likely cause of the findings in that particular case." Id. at 356 (quoting Clausen, 339 F.3d at 1057 n.4).

"The net opinion rule is not a standard of perfection. The rule does not mandate that an expert organize or support an opinion in a particular manner that opposing counsel deems preferable." Townsend, 221 N.J. at 54. When a "defendant raises a genuine factual issue about the causation of plaintiff's claimed injuries by pointing to other injuries the plaintiff may have experienced" it is for a jury to decide "that disputed issue of causation," "except in those unusual instances when no reasonable fact-finder could conclude that the permanent injury was caused by the subject [incident]." Davidson v. Slater, 189 N.J. 166, 170 (2007). The Supreme Court in Davidson considered a plaintiff's verbal threshold claim, under the Automobile Insurance Cost Reduction Act,

24

N.J.S.A. 39:6A-1.1 to -35, and explained that "a plaintiff need not produce affirmative medical evidence segregating what plaintiff considers to be non-causes of the alleged injury in order to avoid a directed verdict." Id. at 187.

After reviewing Dr. Forman's report and deposition testimony, we are convinced he provided the requisite medical foundation and factual reasons for his opinion. He described the "widely" accepted forensic "psychiatric" assessment screening and the "[d]iagnostic [f]ormulation" he used in determining that Roe's suffered sexual assaults at HSHS caused her PTSD. Further, Dr. Forman explained the assessment methodology he administered to Roe was a "structured" "[n]europsychiatric [i]nterview" and based on the DSM-5 criteria. At his deposition, Dr. Forman acknowledged his report did not include his consideration of Roe's sexual assault in the van, but he attested to reviewing her deposition testimony regarding the later assault and to considering the information in his medical evaluation. After Dr. Forman considered Roe's subsequent sexual assault and the facts surrounding the janitor's sexual assaults, he opined within a reasonable degree of medical certainty that Roe "developed PTSD related to the serial rapes she experienced at" HSHS.

Dr. Forman specifically delineated the facts he found relevant in formulating his psychiatric opinion against recognized forensic standards. He

A-1884-24

opined with medical certainty that Roe's PTSD was caused by the sexual assaults at HSHS because: the sexual assaults at HSHS occurred first and "repeatedly"; Roe had disclosed the assaults to "a teacher . . . soon after" but the teacher failed "to protect her"; Roe's primary triggers were related to the sexual assaults at HSHS; and it was "devastating" to Roe that the "perpetrator [was] employed by an institution charged with educating and nurturing her." Dr. Forman also highlighted that the "serial rapes" at HSHS were especially "devastating" to Roe as a "member [of] a heavily discriminated against minority" group. Because Dr. Forman's report provided the accepted standards and facts he relied upon, we part ways with the trial court's determination that Dr. Forman's opinion "failed to differentiate . . . the other sexual assaults that [p]laintiff had endured." Further, his opinion and the omission of Roe's sexual assault in the van from his report are the "proper 'subject of exploration and cross-examination at a trial.'" Townsend, 221 N.J. at 54-55 (quoting Rosenberg v. Tavorath, 352 N.J. Super. 385, 402 (App. Div. 2002)).

We next address whether Dr. Forman's failure to use the word "permanent" in his opinion warrants barring his testimony. Dr. Forman's report indicated that, after he diagnosed Roe with PTSD, he concluded her symptomology had continued into her adult life. He found Roe's PTSD had

26

"profound" "repercussions" and highlighted: Roe's childhood sexual abuse caused "deep-seated psychological trauma that persists into adulthood"; "the traumatic past casts long shadows over her adult life"; "Roe's sexual victimization has [continued affecting] her adult mental functioning"; "[n]euroscientific research has provided" that childhood sexual abuse can create "a biological change to one's brain – a physical injury"; she continuously "experiences her victimization"; "the traumatic nature of her experience can trap her in a state of silence"; and research supports "the subsequent onset of PTSD" and "the long-term effects."

Dr. Forman's opinion did not use the TCA permanency terminology but clearly contained multiple references to Roe's continued long-term PTSD. Therefore, because a fair reading and extrapolation of his report indicates that Dr. Forman concluded Roe's PTSD sequelae will persist, this issue needs to be clarified. Accordingly, the court is directed on remand to hold an N.J.R.E. 104 hearing to address his opinion on permanency.

When determining whether "to strike an expert report, a trial court may conduct a hearing under N.J.R.E. 104(a)." Id. at 54 n.5. "The court shall decide any preliminary question about whether a witness is qualified, . . . or evidence is admissible" and "may hear and determine such matters out of the presence or

27                                                              A-1884-24

hearing of the jury."  N.J.R.E. 104(a).  On remand, the court shall determine whether Dr. Forman opines that Roe continues to suffer PTSD "repercussions" in adulthood to satisfy that she suffers a "permanent loss of a bodily function" within a reasonable degree of medical certainty.

We also conclude Roe has established a genuine issue of material fact that her medical expenses exceeded the TCA's $1,000 threshold.  Again, the parties have stipulated on appeal that the applicable TCA threshold amount is $1,000, rather than the current "$3,600 threshold."  Roe certified in her responses to interrogatories that she began therapy in December 2023, and was in treatment with "a Primary Therapist at Sun Point Wellness Center."  She estimated her treatment costs over the year were "at least $3,120" and Dr. Forman noted Roe was "participating in therapy sessions two[]times per month at a cost of $130.00 per visit."  The record does not disclose whether defendant received medical releases for the treatment and payments made.  Because Roe has demonstrated sufficient disputed facts showing she vaulted the $1,000 threshold, we need not address whether Dr. Forman's estimated "future treatment costs satisfy the monetary threshold."  C.W., 474 N.J. Super. at 653.

In remanding this matter, we have not determined that Roe's claim against the Board must be submitted to the jury.  Instead, the facts will need to be

developed at trial during Roe's case. If Roe cannot present facts from which a reasonable jury could find that the school "tacitly approved" the misconduct that led to Roe's sexual assaults, her claim against the Board may be subject to a directed verdict motion. See Hornor, ___ N.J. at ___ (slip op. at 46).

Finally, we address the Board's cross-appeal argument that the court erred in finding Dr. Schwartzberg's opinion admissible. The Board contends Dr. Schwartzberg's liability opinion was a net opinion because it "fail[ed] to identify the objective standard of care." After a review of Dr. Schwartzberg's opinion and the record, we disagree.

Dr. Schwartzberg based his opinions on the "school district's obligations and duties known as the 'in loco parentis standard'" and referenced CAPTA. He opined the Board did not have the required policies and procedures in place at the time Roe was a student, that they did not follow, "properly implement[,] or enforce" policies and procedures, and defendants failed to "properly supervise and protect" Roe. The court found Dr. Schwartzberg "set forth the why and wherefore" required because his opinion was "based on . . . evidence" in the record.

We are unpersuaded by the Board's argument that Dr. Schwartzberg was not permitted to rely on the in loco parentis principle. Dr. Schwartzberg opined

A-1884-24

that the "'in loco parentis standard' means that a school district, in assuming physical custody and control over one of its students, effectively t[akes] the place of the student's parents." This doctrine, which serves as the primary basis for his opinions, is well established. Our Supreme Court has recognized that "[s]chool officials have a general duty 'to exercise reasonable supervisory care for the safety of students entrusted to them, and [are accountable] for injuries resulting from failure to discharge that duty.'" Jerkins v. Anderson, 191 N.J. 285, 296 (2007) (quoting Caltavuturo v. City of Passaic, 124 N.J. Super. 361, 366 (App. Div. 1973)). "The standard of care imposed upon school personnel in carrying out this duty to supervise is that degree of care which a person of ordinary prudence, charged with comparable duties, would exercise under the same circumstances." Caltavuturo, 124 N.J. Super. at 366.

Dr. Schwartzberg also sufficiently provided his "education, training, and substantial experience" in areas of school administration, including supervision and safety. He has over "[forty-five] years" of "professional educational experience." Dr. Schwartzberg's reference to CAPTA was in the context of defining "child abuse and neglect," which contemplates "at a minimum, any recent act or failure to act on the part of a parent or caretaker . . . ." 42 U.S.C.

A-1884-24

§ 5106g (1996) (amended 2023).  For these reasons, we are satisfied Dr. Schwartzberg did not provide a net opinion.

We note the Board further asserts that "Dr. Schwartzberg is . . . factually incorrect that the [Board] did[ not] have policies concerning the prevention of sexual abuse in 1989 or 1990."  The Board highlights E.R.'s deposition testimony as its "corporate designee."  E.R. testified that "regulations had been put into place," he "was able to find . . . the updated versions of . . . the document" containing the regulations, but he could not "locate any prior" policies existing at the time Roe attended HSHS.  The Board did not depose Dr. Schwartzberg to address his opinion in light of E.R.'s testimony and the lack of HSHS policies and procedures produced regarding student safety and supervision.  See Congiusti v. Ingersoll-Rand Co., 306 N.J. Super. 126, 131 (App. Div. 1997) (deposing experts before trial more "fully reveal[s] the bases for" the "theories in their reports"); see also R. 4:10-2(d)(2).  At trial, the Board will have the opportunity to cross-examine the expert regarding his factual bases, including whether he considered that the Board was called to produce records from over thirty years ago.  For these reasons, we discern no error in the court's finding that Dr. Schwartzberg did not render a net opinion.

To the extent that we have not addressed the parties' remaining contentions, it is because they lack sufficient merit to be discussed in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part, reversed in part, and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

32